**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Donald P. ROHRIG, Defendant–Appellee.**

No. 94–4207.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 3, 1995.

Decided Oct. 31, 1996.

Vicki S. Marani (argued), Department of Justice, Criminal Division, Appellate Section, Washington, DC, Sean Connelly (briefed), U.S. Department of Justice, Criminal Division, Washington, DC, Robert E. Bulford, Asst. U.S. Attorney, Office of the U.S. Attorney, Akron, OH, for Plaintiff–Appellant.

Tom A. Borcoman (argued and briefed), Borcoman & Lindsey, Canton, OH, for Defendant–Appellee.

Before: SILER and DAUGHTREY, Circuit Judges; ROSEN, District Judge.*

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

ROSEN, D.J., delivered the opinion of the court, in which SILER, J., joined.

DAUGHTREY, J. (pp. 1526–27), delivered a separate dissenting opinion.

ROSEN, District Judge.

In this case, we are called upon to determine whether police officers violated the Fourth Amendment by entering a private home without a warrant in the early hours of the morning in response to a neighbor's complaint about loud music emanating from that home. The district court found that the officers' warrantless entry violated the Fourth Amendment, and accordingly granted the motion of Defendant–Appellee Donald P. Rohrig to suppress evidence the officers discovered upon entering his home, including marijuana and a sawed-off shotgun. We conclude, however, that the officers' conduct satisfied the Fourth Amendment standard of "reasonableness," and we therefore reverse.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

In the early morning hours of May 22, 1994, Canton, Ohio, Police Officers John Clark and Walter Tucker received a complaint of loud noise emanating from the residence of Defendant–Appellee Donald P. Rohrig ("Defendant"). As the officers approached within a block of Defendant's home in their squad car, they began to hear loud music. Shortly after the officers arrived on the premises at 1:39 a.m., somewhere between four and eight pajama-clad neighbors emerged from their homes to complain about the noise.

Using the end of his flashlight, Officer Clark banged repeatedly on the front door of Defendant's home, but received no response. While Officer Tucker returned to the squad car in an attempt to obtain the telephone number of the residence, Officer Clark walked around the outside of the two-story residence, all the while tapping to no avail on its first-floor windows. As he walked outside the house, he observed two stereo speakers in the first-floor living room and another pair of speakers in an upstairs room, with speaker wire running between the two floors on the outside of the home.

Upon reaching the back door of Defendant's home, Officer Clark discovered that it was open, with only an unlocked screen door preventing access into the house. He called to Officer Tucker, who abandoned his effort to obtain a telephone number and joined Officer Clark at the back door. The officers knocked and hollered to announce their presence, but again received no answer. They then opened the unlocked screen door, passed through a porch and through the open back door, and emerged into a kitchen.

All along the way, and each time the officers entered a room, Officer Clark continued to announce that he was with the Canton Police, and to ask whether anyone was home. At the suppression hearing, Officer Clark testified that the music inside the house was so loud that the officers had to raise their voices in order to communicate with each other. Defendant testified, however, that only the upstairs stereo speakers, and not the two downstairs speakers, were turned on at the time the officers entered his home.

A light was on in the kitchen when the officers entered, but the remaining first-floor rooms were dark. The officers then observed another light emerging from an open doorway. Proceeding through this doorway toward the light, they travelled down some stairs and into Defendant's basement. The officers testified that they went downstairs not because they believed that was the source of the loud music, but because they hoped to find an occupant of the home who could turn the music down. Upon reaching the basement, the officers discovered "wall-to-wall" marijuana plants, as well as fans and running water.

Having failed to locate anyone in the basement, the officers returned to the first floor, and then travelled upstairs to the second floor, continuing to announce their presence. At the top of the stairs, Officer Clark observed a man lying on the floor of one of the two bedrooms, and also discovered that this room contained the stereo that was the source of the loud music. As Officer Clark attempted to rouse the sleeping man, who turned out to be Defendant, Officer Tucker turned down the offending stereo.

At the suppression hearing, Officer Clark testified that Defendant became combative and started swearing as he was awakened, so that the officer was forced to handcuff him. Defendant, however, testified that his first recollection of the events of that night was waking up in handcuffs. Once the officers determined that nobody else was in the other upstairs bedroom, they ceased their search and contacted a supervisor. In turn, the supervisor contacted Detective Swihart of the Canton vice unit.

Upon his arrival at Defendant's home at around 2:40 a.m., Detective Swihart was briefed by Officer Clark, was shown the grow operation in the basement, and was led upstairs where Defendant remained handcuffed. The detective brought Defendant downstairs, uncuffed him, issued *Miranda* warnings, and produced and explained a consent form in an effort to obtain Defendant's consent to a further search of his home.

Swihart testified that, although he could tell that Defendant had been drinking,[1] Defendant nevertheless appeared coherent and neither slurred his speech nor stumbled when he walked. Swihart further testified that he informed Defendant that he need not sign the consent form, but that it would be easier and quicker if Defendant signed the form because the officers otherwise would seek a search warrant. After Defendant signed the form, the subsequent search turned up some processed marijuana and two firearms, including an illegal sawed-off shotgun found in the closet of the bedroom in which Defendant was initially discovered.

At the suppression hearing, Defendant disputed some of the details of Detective Swihart's account. First, he testified that Swihart had created the impression that he would be immediately arrested if he refused to sign the consent form. Next, Defendant stated that he heard police officers "messing with" the guns from his upstairs closet even before he signed the consent form.

Before leaving Defendant's residence that night, the police officers seized approximately 150 marijuana plants from the basement, the processed marijuana, and the two firearms. The officers, however, did not arrest Defendant that night, because Detective Swihart wished to first consult with federal authorities. Rather, Defendant was issued a citation for violating a Canton, Ohio, noise ordinance that prohibits operation of "any noise-making device" in such a manner that "the peace or good order of the neighborhood is disturbed." Canton, Ohio, General Code § 509.12. A violation of this ordinance is classified as a "minor misdemeanor," and is punishable only by a maximum fine of $100 and no incarceration. Defendant subsequently admitted that he violated this ordinance, and paid a fine of $25.

Defendant was eventually charged with two federal offenses: (1) possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and (2) possession of an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5861. Defendant subsequently filed a motion to suppress the marijuana and shotgun found in his home, contending that the Canton police officers' warrantless entry into his home violated the Fourth Amendment.

After conducting an evidentiary hearing on October 14, 1994, Judge George W. White of the United States District Court for the Northern District of Ohio agreed with Defendant's contention, and accordingly granted Defendant's motion to suppress. Specifically, in a ruling from the bench, Judge White found that, regardless of whether anyone appeared to be at home or whether the door was unlocked, the officers could not lawfully enter Defendant's home in order to turn down the loud music without first securing a warrant. Consequently, because this illegal entry tainted all of the subsequently discovered evidence, Judge White concluded that the marijuana and shotgun must be suppressed.[2] The Government appeals this ruling.

---

1. At the hearing, Defendant testified that he had consumed six beers beginning at around 9:00 or 9:30 p.m. in the evening.

2. Judge White also questioned whether Defendant had the capacity to consent to the complete search of his home after he had been awakened by the Canton police officers. However, the district court did not expressly rule on that issue,

## II. ANALYSIS

### A. The Standards Governing This Appeal

■ In reviewing the district court's decision to grant Defendant's motion to suppress, we will not disturb that court's factual findings unless they are clearly erroneous. *United States v. Johnson,* 9 F.3d 506, 508 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994). In this case, neither party challenges the district court's factual determinations.

■ However, we review *de novo* any conclusions of law the district court reached in granting Defendant's motion. *Johnson,* 9 F.3d at 508. In particular, the *de novo* standard governs our review of district court's determination that no exigency justified the Canton police officers' warrantless entry into Defendant's home. In reviewing this conclusion, "we consider the totality of the circumstances and the 'inherent necessities of the situation at the time.'" *Johnson,* 9 F.3d at 508 (quoting *United States v. Rubin,* 474 F.2d 262, 268 (3d Cir.1973)).

### B. The Officers' Warrantless Entry into Defendant's Home to Abate Loud Music Was Not "Unreasonable" Under the Fourth Amendment.

#### 1. Warrantless Entries Under the Plain Language of the Fourth Amendment

The central question we confront in this appeal is whether the Canton police officers violated the Fourth Amendment to the United States Constitution when they entered Defendant's home without first securing a warrant. In order to resolve this question, we naturally look first to the language of the Amendment itself:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

but instead relied on the warrantless entry as the basis for granting Defendant's motion to sup-

searched, and the persons or things to be seized.

U.S. Const. amend. IV.

At first glance, the language of the Fourth Amendment appears to suggest two potential "shortcuts" in our inquiry whether the officers' warrantless entry was lawful. First, because the Amendment speaks of "searches and seizures," and because the officers apparently intended to conduct neither a search nor a seizure upon entering Defendant's home, one could argue that the Amendment simply does not apply to the entry at issue here. Next, based on the Amendment's division into two separate and apparently independent parts, the "Reasonableness" Clause and the "Warrant" Clause, one could posit that the officers' entry need only have been "reasonable," and that the absence of a warrant for their entry does not bear on this reasonableness inquiry. However, our survey of the relevant case law reveals that neither of these two approaches is reconcilable with the prevailing judicial construction of the Fourth Amendment.

First, the Supreme Court has firmly and repeatedly rejected the proposition that the Fourth Amendment offers no protection against government entry into a home unless the entry is for the purpose of performing a traditional "search" or "seizure." For example, in *Camara v. Municipal Court,* 387 U.S. 523, 526, 534, 87 S.Ct. 1727, 1729, 1733, 18 L.Ed.2d 930 (1967), the Court found that an administrative inspection for possible violations of a city's housing code was a "significant intrusion[ ] upon the interests protected by the Fourth Amendment." In so holding, the Court expressly overturned its earlier ruling in *Frank v. Maryland,* 359 U.S. 360, 367, 79 S.Ct. 804, 809, 3 L.Ed.2d 877 (1959), that administrative inspections "touch at most upon the periphery of the important interests safeguarded by the Fourteenth Amendment's protection against official intrusion." The *Camara* Court reasoned that official intrusions of any sort implicate Fourth Amendment values:

press.

We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime. For this reason alone, *Frank* differed from the great bulk of Fourth Amendment cases which have been considered by this Court. But we cannot agree that the Fourth Amendment interests at stake in these inspection cases are merely "peripheral." It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior. For instance, even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security. And even accepting *Frank's* rather remarkable premise, inspections of the kind we are here considering do in fact jeopardize "self-protection" interests of the property owner. Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint.

*Camara*, 387 U.S. at 530–31, 87 S.Ct. at 1731–32 (footnotes omitted).

More recently, in *Michigan v. Tyler*, 436 U.S. 499, 501, 506, 98 S.Ct. 1942, 1945, 1948, 56 L.Ed.2d 486 (1978), the Court held that the Fourth Amendment applied to the search of a burned furniture store by firefighters in order to determine the origin of the blaze. The Court stated:

> [T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately. Searches for administrative purposes, like searches for evidence of

crime, are encompassed by the Fourth Amendment.

436 U.S. at 506, 98 S.Ct. at 1948; *see also Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (holding that drug and alcohol testing of railroad employees is governed by the Fourth Amendment); *New York v. Burger*, 482 U.S. 691, 693, 699, 107 S.Ct. 2636, 2639, 2642, 96 L.Ed.2d 601 (1987) (finding that the Fourth Amendment governs a warrantless search of an automobile junkyard); *New Jersey v. T.L.O.*, 469 U.S. 325, 333–36, 105 S.Ct. 733, 738–40, 83 L.Ed.2d 720 (1985) (holding that the Fourth Amendment applies to searches conducted by public school officials).

■ Thus, in the instant matter, the actions of the Canton police officers cannot altogether escape scrutiny under the Fourth Amendment, regardless of whether those actions were primarily directed at abating loud noise rather than enforcing the law. Indeed, *Camara* leaves no room for a contrary conclusion. Because Defendant was cited for disturbing the peace in violation of a Canton ordinance, the officers' entry ultimately served a law enforcement purpose. Consequently, the entry challenged Defendant's "self-protection" interests as described in *Camara*, and thereby implicated the Fourth Amendment's strictures against certain types of "unreasonable" government action. Furthermore, *Camara* and its progeny dictate the broader conclusion that the Fourth Amendment would govern the officers' entry into Defendant's home even if that entry neither served nor was intended to serve any law enforcement purpose whatsoever. The Amendment's protections were triggered solely by the governmental intrusion into Defendant's home.

Next, any attempt to completely divorce the Fourth Amendment's Warrant Clause from our inquiry into the "reasonableness" of the entry into Defendant's home likewise runs afoul of Supreme Court precedent. Although the express language of the Fourth Amendment would appear to support such a

construction,[3] the Court has steadfastly refused to view the Amendment's two clauses in isolation from one another. Rather, the Court has repeatedly found that the reasonableness of a government intrusion must be evaluated with the Warrant Clause in mind.

The Court's view of the relationship between the two clauses derives primarily from its analysis of the framers' intent in enacting the Fourth Amendment. In particular, the Court has frequently noted the American colonists' repugnance to the English practice of issuing general "writs of assistance" to authorize searches of private homes at the unchecked discretion of government officials. *See, e.g., Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980) ("It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." (footnote omitted)); *United States v. Chadwick*, 433 U.S. 1, 7–8, 97 S.Ct. 2476, 2481–82, 53 L.Ed.2d 538 (1977); *Stanford v. Texas*, 379 U.S. 476, 481–82, 85 S.Ct. 506, 509–10, 13 L.Ed.2d 431 (1965); *Frank v. Maryland*, 359 U.S. 360, 363–65, 79 S.Ct. 804, 807–08, 3 L.Ed.2d 877 (1959); *Boyd v. United States*, 116 U.S. 616, 624–25, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886). Citing this history, Justice Frankfurter forcefully explained why, in his view, the Fourth Amendment's Reasonableness and Warrant clauses are inextricably interrelated:

> One cannot wrench "unreasonable searches" from the text and context and historic content of the Fourth Amendment. It was the answer of the Revolutionary statesmen to the evils of searches without warrants and searches with warrants unrestricted in scope. Both were deemed "unreasonable." Words must be read with the gloss of the experience of those who framed them.... When the Fourth Amendment outlawed "unreasonable searches" and then went on to define the very restricted authority that even a search warrant issued by a magistrate could give, the framers said with all the clarity of the gloss of history that a search is "unreasonable" unless a warrant authorizes it, barring only exceptions justified by absolute necessity.

*United States v. Rabinowitz*, 339 U.S. 56, 70, 70 S.Ct. 430, 436–37, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).

This view of the relationship between the Fourth Amendment's Reasonableness and Warrant Clauses has led the Supreme Court to declare, as a "basic principle of Fourth Amendment law," that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (footnote omitted). In stating this general rule, the *Payton* Court found that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and reasoned that "the warrant procedure minimizes the danger of needless intrusions of that sort." 445 U.S. at 585–86, 100 S.Ct. at 1379–80 (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)).

Even where a search or seizure does not involve entry into a private residence, the Court has found that the Warrant Clause bears upon the reasonableness of the government action. For instance, in *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977), the Court concluded that a warrantless search of a locked footlocker was unreasonable under the Fourth Amendment. The Government had

---

**3.** For instance, the plain language of the Fourth Amendment seems to permit a construction under which the two clauses would operate largely independently. In this view, the first clause would provide the sole substantive restriction on searches and seizures—namely, that they be reasonable. The second clause would then specify substantive and procedural restrictions on the issuance of warrants—namely, that they be supported by probable cause and by oath or affirmation, and that they specifically describe the places to be searched or the persons or things to be seized. However, under this literal approach, the Warrant Clause would have nothing to say about whether a search or seizure is "reasonable" or whether the presence or lack of a warrant affects its reasonableness; rather, that Clause would only state the applicable requirements in the (unspecified) event that a warrant is required.

argued that the absence of a warrant should not affect the "reasonableness" inquiry in searches occurring outside the home, where "less significant privacy values are at stake." 433 U.S. at 6–7, 97 S.Ct. at 2481. The Court rejected this argument, relying in part on the "strong historical connection between the Warrant Clause and the initial clause of the Fourth Amendment, which draws no distinction among 'persons, houses, papers, and effects' in safeguarding against unreasonable searches and seizures." 433 U.S. at 8, 97 S.Ct. at 2482. Thus, the Court concluded that the Warrant Clause provides vital safeguards against unreasonable searches, whether in or out of the home. 433 U.S. at 9–11, 97 S.Ct. at 2482–83; *see also Camara*, 387 U.S. at 531–33, 87 S.Ct. at 1732–33 (finding that the "warrant machinery contemplated by the Fourth Amendment" serves important purposes in the context of administrative searches). *But see South Dakota v. Opperman*, 428 U.S. 364, 375–76, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976) (holding that a warrantless "caretaking search of a lawfully impounded automobile" does not violate the Fourth Amendment); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (finding that a warrantless arrest in a public place based on probable cause is not unreasonable).

In concluding that the Warrant Clause bears on reasonableness under a wide variety of circumstances, the Supreme Court has frequently cited Justice Jackson's eloquent explanation of the important purposes served by the warrant requirement:

The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the peo-

ple's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (footnotes omitted). This vision of the purposes behind the warrant requirement continues to guide the Court:

An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope. A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case.

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 621–22, 109 S.Ct. 1402, 1415–16, 103 L.Ed.2d 639 (1989) (citations omitted).

■ This case law unequivocally precludes us from treating the Reasonableness and Warrant Clauses of the Fourth Amendment as involving entirely separate inquiries. Rather, under existing precedent, the officers' failure to obtain a warrant before entering Defendant's home defeats the straightforward proposition that their conduct satisfied the Fourth Amendment solely by virtue of its "reasonableness." Admittedly, such a claim holds great appeal to common sense, particularly under the circumstances presented here. However, our survey of the case law that has identified and shaped fundamental Fourth Amend-

ment principles leads us to the following rule: In the absence of a warrant authorizing the officers' entry into Defendant's home, the Government must overcome the presumption that this entry was unreasonable.

## 2. The "Exigent Circumstances" Justification for Warrantless Entries

Having established the basic principles that inform our application of the Fourth Amendment to the instant matter, we next turn to the case law specifically addressing the circumstances under which warrantless entries into private homes are permitted. As noted above, we are compelled to start with the general rule that such warrantless entries are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). In stating this rule, the *Payton* Court reasoned that "neither history nor this Nation's experience requires us to disregard the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." 445 U.S. at 601, 100 S.Ct. at 1387–88 (footnote omitted).

However, *Payton's* general rule is not without exceptions. Indeed, the *Payton* Court itself recognized, without considering the issue, that "exigent circumstances" may justify a warrantless entry into a home. 445 U.S. at 583, 100 S.Ct. at 1378. Subsequent cases have addressed the types of situations that might present such "exigent circumstances." While it is not possible to articulate a succinct yet exhaustive list of circumstances that qualify as "exigent," we have previously characterized the situations in which warrantless entries are justified as lying within one of four general categories: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir.1994). Before returning to our analysis of the instant matter, it is instructive to review some prior cases that have considered the nature and scope of these various exigencies. In particular, we find that certain cases

involving the "hot pursuit" and "risk of danger" exceptions aid our resolution of this matter.

The "hot pursuit" justification for warrantless entry into a house derives primarily from the Supreme Court cases of *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In *Hayden*, upon being informed by witnesses that an armed robber had entered a home minutes earlier, the police pursued the suspect into the home without first attempting to secure a warrant. *Hayden*, 387 U.S. at 297, 87 S.Ct. at 1645. Because "[s]peed here was essential" in order "to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived," the Court concluded that the warrantless entry was reasonable. 387 U.S. at 299, 87 S.Ct. at 1646. The Court reasoned that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." 387 U.S. at 298–99, 87 S.Ct. at 1646.

Similarly, in *Santana*, the Court upheld a warrantless entry into a home where the defendant, a suspect in an ongoing drug transaction, had been standing in the doorway with a brown paper bag in her hand, but had retreated into the vestibule as police officers pulled up to her house and shouted "police" while exiting their vehicle. *Santana*, 427 U.S. at 40, 43, 96 S.Ct. at 2408, 2410. The Court found that the officers' entry through the open door of the defendant's house constituted "hot pursuit," and thus was permitted both under *Hayden* and in light of the officers' "realistic expectation that any delay would result in destruction of evidence." 427 U.S. at 42–43, 96 S.Ct. at 2409–10. Moreover, because the defendant "was exposed to public view" in the doorway of her house, the Court found that she was "not in an area where she had any expectation of privacy." 427 U.S. at 42, 96 S.Ct. at 2409. Noting that public warrantless arrests were permitted under *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the *Santana* Court reasoned that it

would be anomalous to allow a suspect to evade a lawful public arrest simply by fleeing into a private residence. 427 U.S. at 42, 96 S.Ct. at 2409.

Turning next to the "risk of danger" exigency, we discover that the Supreme Court has most frequently cited this rationale for warrantless entries in cases where the Government is acting in something other than a traditional law enforcement capacity. For example, in *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978), the Court recognized that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'" Likewise, in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court noted a limit to its holding that warrants are required for administrative searches:

> Since our holding emphasizes the controlling standard of reasonableness, nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. *See North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (seizure of unwholesome food); *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (compulsory smallpox vaccination); *Compagnie Francaise de Navigation à Vapeur v. Louisiana State Board of Health,* 186 U.S. 380, 22 S.Ct. 811, 46 L.Ed. 1209 (health quarantine); *Kroplin v. Truax,* 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle). On the other hand, in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day.

387 U.S. at 539, 87 S.Ct. at 1736.

Finally, in *Welsh v. Wisconsin,* 466 U.S. 740, 742–43, 753–54, 104 S.Ct. 2091, 2093–94, 2099–2100, 80 L.Ed.2d 732 (1984), the Court surveyed the various exigencies it had previously recognized, and concluded that none applied to a warrantless entry into a home in search of an apparently inebriated driver who had swerved his automobile off the road and then walked away from the scene. The Court summarily rejected most of the State's appeals to exigent circumstances:

> The State attempts to justify the arrest by relying on the hot-pursuit doctrine, on the threat to public safety, and on the need to preserve evidence of the petitioner's blood-alcohol level. On the facts of this case, however, the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime. Moreover, because the petitioner had already arrived home, and had abandoned his car at the scene of the accident, there was little remaining threat to the public safety. Hence, the only potential emergency claimed by the State was the need to ascertain the petitioner's blood-alcohol level.

466 U.S. at 753, 104 S.Ct. at 2099.

Turning to the State's claimed need to preserve evidence, the *Welsh* Court found that this exigency was not sufficiently compelling under the facts of the case to justify a warrantless entry into a home. 466 U.S. at 754, 104 S.Ct. at 2100. The Court's determination rested primarily on the minor, non-criminal nature of the traffic offense the entering police officers were investigating. 466 U.S. at 746, 754, 104 S.Ct. at 2095–96, 2100.[4] The Court reasoned that the seriousness of the underlying offense affects the weight of the governmental interest being served by the intrusion; because this interest is at an ebb in arrests for minor offenses, "the government usually should be allowed to make such arrests only with a warrant." 466 U.S. at 750, 104 S.Ct. at 2098. Thus, the Court concluded that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." 466 U.S. at 753, 104 S.Ct. at 2099.

4. The Court noted that the petitioner eventually was charged with a criminal misdemeanor because of his prior record of traffic offenses. However, because the entering officers did not know of this prior record, the Court treated the entry as serving solely to investigate a "nonjailable traffic offense that constituted only a civil violation under the applicable state law." 466 U.S. at 746 n. 6, 104 S.Ct. at 2096 n. 6.

We readily acknowledge the hazards of venturing sweeping generalizations about the fact-specific inquiries called for under the Fourth Amendment. Nevertheless, several underlying principles emerge from our survey of the case law regarding "exigent circumstances." First, the cases finding exigent circumstances uniformly cite the need for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the circumstances. *See, e.g., Santana,* 427 U.S. at 43, 96 S.Ct. at 2410; *Hayden,* 387 U.S. at 299, 87 S.Ct. at 1646; *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966).

Next, when considering whether exigent circumstances are present, the Court has frequently adopted a "balancing" approach, weighing the governmental interest being served by the intrusion against the individual interest that would be protected if a warrant were required. For example, the *Welsh* Court relied on this "balancing of interests" approach in concluding that, because the government's interest is necessarily less compelling in cases involving minor offenses, the gravity of the underlying offense is "an important factor to be considered when determining whether any exigency exists." *Welsh,* 466 U.S. at 750–53, 104 S.Ct. at 2098–99.

This "balancing of interests" approach derives principally from the Supreme Court's decision in *Camara, supra.* Having concluded that warrants are required for administrative inspections, the *Camara* Court next had to articulate a "probable cause" standard that would provide meaningful protections without defeating the legitimate aims of such inspections. Noting that different governmental interests are served when public officials conduct criminal investigations versus administrative inspections, the Court reasoned that a specially tailored showing of "probable cause" would suffice in the administrative context:

> Unlike the search pursuant to a criminal investigation, the [administrative] inspection programs at issue here are aimed at securing city-wide compliance with minimum physical standards for private prop-

erty. The primary governmental interest at stake is to prevent even the unintentional development of conditions which are hazardous to public health and safety.... In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of these reasonable goals of code enforcement.

> \* \* \* \* \* \*

> It has been suggested that so to vary the probable cause test from the standard applied in criminal cases would be to authorize a "synthetic search warrant" and thereby to lessen the overall protections of the Fourth Amendment. But we do not agree. The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant.

387 U.S. at 535, 538–39, 87 S.Ct. at 1734, 1736 (footnote and citations omitted).

More recently, in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the Court noted that, "[w]hen faced with ... special [governmental] needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the particular context." 489 U.S. at 619, 109 S.Ct. at 1414. Upon juxtaposing the various purposes served by the warrant requirement against the governmental interests served by alcohol and drug testing of railroad employees, the *Skinner* Court determined that "insistence on a warrant requirement would impede the achievement of the Government's objective." 489 U.S. at 622–23, 109 S.Ct. at 1416; *see also Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990) ("[I]n determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental in-

terests."); *Griffin v. Wisconsin,* 483 U.S. 868, 872–77, 107 S.Ct. 3164, 3168–70, 97 L.Ed.2d 709 (1987) (citing *Camara* in upholding warrantless searches of probationers' homes); *New Jersey v. T.L.O.,* 469 U.S. 325, 337–43, 105 S.Ct. 733, 740–43, 83 L.Ed.2d 720 (1985) (adopting *Camara's* balancing approach in determining that warrantless searches by school authorities need not be supported by traditional probable cause).

Finally, in applying this balancing approach, the Court has suggested that exigent circumstances will more likely be found where the traditional privacy of the home has been compromised in some way. For example, the *Santana* Court found that the defendant had forfeited any reasonable expectation of privacy by moving into the doorway of her house, thereby exposing herself "to public view, speech, hearing, and touch." *Santana,* 427 U.S. at 42, 96 S.Ct. at 2409. Once police officers spotted the defendant in this "public" place, she could not regain her expectation of privacy and reinstate the warrant requirement by retreating into her home. 427 U.S. at 42–43, 96 S.Ct. at 2409–10.

■ This focus on privacy as an element of the "exigent circumstances" determination derives from the Supreme Court's recognition that the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion." *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967). In Justice Harlan's oft-quoted formulation, an individual can invoke the Fourth Amendment's protections only by satisfying a "twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Although Justice Harlan noted that "a man's home is, for most purposes, a place where he expects privacy," 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring), the *Katz* Court nevertheless recognized that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." 389 U.S. at 351, 88 S.Ct. at 511.

Under the balancing approach, just as an appeal to a compelling governmental interest

has led the Supreme Court to forgo the warrant requirement or modify the standard for establishing probable cause, the absence of a strong individual privacy interest has likewise led the Court to uphold warrantless entries under some circumstances. For example, in *Donovan v. Dewey,* 452 U.S. 594, 602, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981), the Court held that warrantless inspections of mines pursuant to the Mine Safety and Health Act did not violate the Fourth Amendment. In support of this conclusion, the Court noted that "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home." 452 U.S. at 598–99, 101 S.Ct. at 2538; *see also South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (citing the diminished expectation of privacy when travelling in automobiles as a justification for warrantless inventory searches); *United States v. Johnson,* 22 F.3d 674, 684 (6th Cir.1994) (Suhrheinrich, J., dissenting) (arguing that a defendant who held a young girl in his apartment against her will had "forfeited whatever reasonable expectation of privacy he had").

■ To summarize, our review of the precedent governing our "exigent circumstances" inquiry reveals that three considerations play key roles. First, we must ask whether the Government has demonstrated a need for immediate action that would have been defeated if the Canton police officers had taken the time to secure a warrant. Next, we must identify the governmental interest being served by the officers' entry into Defendant's home, and ask whether that interest is sufficiently important to justify a warrantless entry. Finally, we must weigh this governmental interest against Defendant's interest in maintaining the privacy of his home, and ask whether Defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy. Accordingly, we now turn to these questions.

### 3. *Exigent Circumstances Justified the Warrantless Entry into Defendant's Home in This Case.*

Having completed our survey of the case law and returned to the instant matter, we

note at the outset that none of the traditionally recognized exigent circumstances is squarely presented under the facts of this case. Plainly, we have here neither hot pursuit of a fleeing felon nor the threat of imminent destruction of evidence. Nor was it necessary for the Canton police officers to act quickly in order to prevent a suspect's escape.

■ In light of the "noise assault" to which Defendant had subjected his neighbors in the middle of the night, the officers arguably could appeal to the "risk of danger" rationale to justify their warrantless entry. Of course, the "danger" here, loud music, does not rise to the level of the dangers recognized in prior cases. For instance, in *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994), we held that police officers had lawfully entered an apartment without a warrant in order to free a fourteen-year-old girl who was being held against her will. Similarly, as noted earlier, the Supreme Court recognized in *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978), that warrantless entries into burning buildings clearly are "reasonable." In contrast, Defendant's conduct here, while certainly a breach of the peace and quiet of the neighborhood, did not pose a substantial or immediate threat to his neighbors' safety. Thus, we cannot comfortably invoke the "risk of danger" rubric in this case. *Cf. Mincey v. Arizona,* 437 U.S. 385, 388–95, 98 S.Ct. 2408, 2411–15, 57 L.Ed.2d 290 (1978) (declining to adopt a categorical exception to the warrant requirement for searches of the scene of a homicide). *See generally* 3 WAYNE R. La-FAVE, SEARCH AND SEIZURE § 6.6(a) (3d ed.1996) (surveying cases involving warrantless entries to render emergency aid and assistance).

This observation, however, does not end our inquiry. Although we acknowledge that the facts of this case do not fit neatly into any of the existing categories of "exigent circumstances," we are nonetheless convinced that these existing categories do not occupy the entire field of situations in which a warrantless entry may be justified. As an initial matter, the Fourth Amendment's broad language of "reasonableness" is flatly at odds with any claim of a fixed and immutable list of established exigencies. Moreover, such a claim would ignore the case-by-case and fact-specific development of the existing categories of exigent circumstances. None of the presently recognized exigencies can claim any special constitutional status; instead, each was a product of distinct and independent analysis of the facts of a particular case in light of underlying Fourth Amendment principles. *See United States v. Acevedo,* 627 F.2d 68, 70 (7th Cir.) ("[T]he limitless array of factual settings that may arise caution against a checklist-type analysis."), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980).

Therefore, if the situation dictates, we are not precluded from fashioning a new exigency that justifies the warrantless entry into Defendant's home. Specifically, under the particular facts of this case, we must consider whether an ongoing and highly intrusive breach of a neighborhood's peace in the middle of the night constitutes "exigent circumstances," and therefore justifies a warrantless entry. As always, we must make this determination in light of Fourth Amendment principles and precedent, and we must be mindful of the needs of the community and society's expectation of the legitimate role of the police.

Although we have found no precedent addressing the precise question whether an ongoing breach of the peace may constitute "exigent circumstances," the Government directs our attention to *People v. Lanthier,* 5 Cal.3d 751, 97 Cal.Rptr. 297, 488 P.2d 625 (1971), in which the California Supreme Court concluded that an ongoing nuisance justified a warrantless intrusion into a student's locker. In *Lanthier,* Joseph Riley, a supervisor of maintenance services at Stanford University, received a complaint "of a noxious odor emanating from somewhere in the study hall," as if "someone had vomited in the room." 97 Cal.Rptr. at 298, 488 P.2d at 626. The odor had first been detected the previous day, and efforts to air out the room had not succeeded. 97 Cal.Rptr. at 298, 488 P.2d at 626. Using a master key, Riley began to open lockers attached to the study hall carrels, and he eventually traced the

smell to a locker used by the defendant, a student at the university. 97 Cal.Rptr. at 298, 488 P.2d at 626. After opening the defendant's locker, Riley discovered that the odor was emanating from a briefcase within; upon opening that briefcase, he discovered 38 packets of marijuana. 97 Cal.Rptr. at 298, 488 P.2d at 626. When the defendant later returned to reclaim his briefcase, he was arrested; he subsequently moved to suppress the marijuana as the product of an illegal search. 97 Cal.Rptr. at 298–99, 488 P.2d at 626–27.

The California Supreme Court affirmed the trial court's denial of the defendant's motion to suppress. 97 Cal.Rptr. at 301, 488 P.2d at 629. In particular, the court found that the situation confronting the maintenance supervisor fell within the "emergency" exception to the warrant requirement, and that a prompt inspection of the defendant's locker therefore was authorized under the rationale of *Camara.* 97 Cal.Rptr. at 300–01, 488 P.2d at 628. The court explained:

> In the case at bar such a "compelling urgency" [as recognized in *Camara* ] was clearly shown. There had indeed been a "citizen complaint" about the malodorous smell permeating the entire study hall, and the smell was no less noticeable to Riley when he arrived to investigate. It was therefore reasonable for him to undertake, in his capacity of maintenance supervisor, a "prompt inspection" of the carrel area for the purpose of discovering and abating the nuisance. And inasmuch as the students entitled to use the room had already been disturbed by this offensive odor throughout the preceding day, further de-

lay in suppressing it would have been unjustifiable.

97 Cal.Rptr. at 300, 488 P.2d at 628.[5]

Beyond *Lanthier,* we have found two other cases that have addressed the Fourth Amendment concerns arising from a warrantless entry to abate an ongoing nuisance. In both cases, police officers entered apartments without warrants after receiving complaints that water was leaking into apartments below. *United States v. Boyd,* 407 F.Supp. 693, 694 (S.D.N.Y.1976); *State v. Dube,* 655 A.2d 338, 339 (Me.1995). In both cases, the courts concluded that leaking water sufficiently threatened the safety of the inhabitants of neighboring apartments to justify a warrantless intrusion. *Boyd,* 407 F.Supp. at 695; *Dube,* 655 A.2d at 340. Moreover, both courts relied on the important fact that the officers did not enter the apartments for the purpose of searching for contraband, but instead were acting to protect the wellbeing of the immediate community. *Boyd,* 407 F.Supp. at 695; *Dube,* 655 A.2d at 340.[6] Thus, in both cases, the courts refused to suppress incriminating evidence— rifles in *Boyd,* squalid conditions in *Dube*— that was discovered in plain view as the officers sought to track down and abate the ongoing nuisance. *Boyd,* 407 F.Supp. at 695; *Dube,* 655 A.2d at 340–41.

■ To the extent, therefore, that the case law addresses situations analogous to the one with which we are confronted, these precedents suggest that a late night disturbance of the peace might well present exigent circumstances that would justify the Canton officers' warrantless entry into Defendant's home. In addition, we believe that the poli-

---

**5.** The court also rejected the defendant's claim that Riley, having abated the immediate nuisance by removing the briefcase from the study hall, acted improperly in opening the briefcase rather than simply storing it where unclaimed student belongings typically were kept. 97 Cal.Rptr. at 300, 488 P.2d at 628. The court noted that storing the briefcase "would not have eliminated the odor but would merely have transferred it to another part of the library building." 97 Cal. Rptr. at 301, 488 P.2d at 629. In contrast, by opening the briefcase, Riley reasonably sought to "determine the precise cause of the smell so as to permit a proper disposition of the offending object." 97 Cal.Rptr. at 301, 488 P.2d at 629. The court thus agreed with the trial court's conclu-

sion that Riley "did what any normal person would have done under those circumstances, having the same duties to perform as he had." 97 Cal.Rptr. at 301, 488 P.2d at 629.

**6.** The *Dube* court went so far as to hold that the police officers did not conduct a Fourth Amendment "search" by accompanying the apartment building's custodian into the apartment and observing whatever was in "plain view." *Dube,* 655 A.2d at 340. *Camara* seems to foreclose such a broad result; it would be more accurate to say that a warrantless entry under such urgent circumstances *implicates* but does not *violate* the Fourth Amendment.

cies which underlie the various traditional exigencies lead to this same result. We previously cited three important considerations in a typical "exigent circumstances" inquiry: (1) whether immediate government action was required, (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion, and (3) whether the citizen's expectation of privacy was diminished in some way. Applying these principles in this case, we find that each of these considerations indicates that the warrantless entry into Defendant's home was justified by exigent circumstances.

■ First, the Canton police officers undoubtedly confronted a situation in which time was of the essence. The officers testified that they arrived at Defendant's residence in the middle of the night in response to complaints from neighbors, and that they could hear loud music at least a block away from the home. Upon their arrival at the scene, they were confronted by an irate group of pajama-clad neighbors. Had the officers attempted to secure a warrant, it is clear that the aural assault emanating from Defendant's home would have continued unabated for a significant period of time. Thus, if we insist on holding to the warrant requirement under these circumstances, we in effect tell Defendant's neighbors that "mere" loud and disruptive noise in the middle of the night does not pose "enough" of an emergency to warrant[7] an immediate response, perhaps because such a situation "only" threatens the neighbors' tranquility rather than their lives or property. We doubt that this result would comport with the neighbors' understanding of "reasonableness." Further, because nothing in the Fourth Amendment requires us to set aside our common sense, we decline to read that Amendment's "reasonableness" and warrant requirements as authorizing timely governmental responses only in cases involving life-threatening danger.

Next, we find that the officers entered Defendant's home in order to vindicate a compelling governmental interest. To be sure, *Welsh, supra,* teaches that the weight of a governmental interest should be measured in part by the severity of the offense being investigated. In the instant matter, Defendant was cited only for a civil violation of a Canton noise ordinance. This might seem to suggest that no vital governmental interest was served by the warrantless entry into Defendant's home.

■ However, we believe that the *Welsh* analysis has less relevance as one moves away from traditional law enforcement functions and toward what the Supreme Court has referred to as "community caretaking functions." *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973); *see also United States v. Johnson,* 9 F.3d 506, 510 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994). To determine the weight of the governmental interest at stake in this case solely by reference to the minor penalty the City of Canton imposes for violations of its noise ordinance would ignore a crucial distinction between *Welsh* and the instant case. Unlike in *Welsh,* the officers here did not enter a private home for the purpose of questioning a suspect or searching for evidence of a suspected offense. Because their aim was not to track down a suspected violator of a local ordinance, we find it inappropriate to gauge the government's interest by looking only to that ordinance.

Rather, by entering Defendant's residence for the limited purpose of locating and abating a nuisance, the officers sought to restore the neighbors' peaceful enjoyment of their homes and neighborhood. In view of the importance of preserving our communities, we do not think that this interest is so insignificant that it can never serve as justification for a warrantless entry into a home. To the contrary, *Camara* and its progeny recog-

---

7. We note, as an aside, that our choice of the word "warrant" in this context is instructive. Our use of that word illustrates with linguistic precision the relationship between circumstances that justify an entry without formal order and the formal order itself, which issues upon a showing of such circumstances. In the former instance, the circumstances themselves justify—or "warrant"—the entry, thereby displacing the requirement that formal authorization be obtained. Quite simply, and in accordance with our commonsense understanding of the dual meanings of the word, the circumstances themselves provide the "warrant."

nize that important governmental interests may be at stake even in the absence of life-or-death circumstances. *See, e.g., T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742 (citing a school's "legitimate need to maintain an environment in which learning can take place"); *see also United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir.1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams."). Indeed, under Ohio law, Canton police officers are expressly charged with the duty to "preserve the peace." Ohio Rev. Code Ann. § 737.11. In addition, Canton's enactment of an ordinance prohibiting use of "any noise-making device" in such a manner that "the peace or good order of the neighborhood is disturbed," Canton, Ohio, General Code § 509.12, shows that the Canton community attaches great importance to its citizens' interest in maintaining peaceful neighborhoods.

█ We conclude, therefore, that the governmental interest in immediately abating an ongoing nuisance by quelling loud and disruptive noise in a residential neighborhood is sufficiently compelling to justify warrantless intrusions under some circumstances. *Cf. Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980) ("Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value."); *Bies v. State,* 76 Wis.2d 457, 251 N.W.2d 461, 468 (1977) (finding that the early morning investigation of a noise complaint is "part of the 'community caretaker' function of the police which, while perhaps lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role"). In particular, a compelling governmental interest supports warrantless entries where, as here, strict adherence to the warrant requirement would subject the community to a continuing and noxious disturbance for an extended period of time without serving any apparent purpose.

█ Moreover, as discussed earlier, *Camara* and its progeny instruct us to balance the governmental interest being served against the individual's interest in remaining free from governmental intrusions. In light of Defendant's course of conduct, we find that he cannot claim the degree of privacy protection that generally attaches to private dwellings. *See Katz,* 389 U.S. at 351, 88 S.Ct. at 511 ("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Just as one's expectation of privacy diminishes as he ventures beyond his doorway, *see Santana, supra,* 427 U.S. at 42, 96 S.Ct. at 2409, Defendant here undermined his right to be left alone by projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace. Indeed, in this case, we cannot protect Defendant's interest in maintaining the privacy of his home without diminishing his neighbors' interests in maintaining the privacy of *their* homes. Accordingly, we find that the governmental interest in preserving a peaceful community is all the more compelling when balanced against Defendant's substantially weakened interest in maintaining the privacy of his home.

█ Finally, in a case not strictly governed by precedent, we necessarily must revisit the fundamental principles underlying the Fourth Amendment. As we have seen, that Amendment defines two unwavering standards. First, its Warrant Clause commands that the Government shoulder the heavy burden of justifying any warrantless entry into a private home. Second, its Reasonableness Clause commands that any Government intrusion, whether authorized by a warrant or not, be reasonable. We conclude that the Canton police officers' warrantless entry into Defendant's home violated neither of these constitutional principles.

█ First, we find that certain aspects of the instant matter also featured prominently in cases in which the Supreme Court has approved warrantless government intrusions. Foremost among these common features is the absence of any purpose a warrant could

have served. It can safely be said that nothing would have been gained if a disinterested magistrate had independently evaluated the Canton officers' claim, based on their first-hand observation of open, obvious, and ongoing conditions, that loud noise was emanating from Defendant's home. A magistrate would either have to accept or reject such a claim on its face; there was no need to draw inferences from ambiguous evidence. Nor could a magistrate have provided a meaningful yet timely assessment as to whether the situation was sufficiently urgent and ongoing to justify an immediate entry. *Compare Michigan v. Tyler*, 436 U.S. 499, 506–08, 98 S.Ct. 1942, 1948–49, 56 L.Ed.2d 486 (1978) (rejecting an argument that a warrant to search a burned building would serve no purpose, and instead finding that a magistrate could consider such factors as "[t]he number of prior entries, the scope of the search, the time of day when it is proposed to be made, the lapse of time since the fire, the continued use of the building, and the owner's efforts to secure it against intruders").

At most, a warrant could have specified the scope of a permissible entry, thereby ensuring that the officers' intrusion was narrowly tailored to the limited purpose of ascertaining the source of the loud music and quelling it. *See Michigan v. Clifford*, 464 U.S. 287, 298, 104 S.Ct. 641, 649, 78 L.Ed.2d 477 (1984); *Tyler*, 436 U.S. at 507–08, 98 S.Ct. at 1949. However, nothing in the record before us suggests that the officers' entry exceeded that narrow purpose, or that they entered Defendant's home under a "pretext" of noise abatement when in fact their actual intent was to perform a law enforcement function such as an arrest or a search for evidence of a crime.[8] *Compare Clifford*, 464 U.S. at 297, 104 S.Ct. at 649 (reasoning that, because investigators had previously determined that a fire had originated in a home's basement, "the search of the upper portion of the house ... could only have been a search to gather evidence of the crime of

arson"). Thus, there is not the slightest indication that the officers' conduct would have been any different if they had secured a warrant before entering Defendant's residence. On the other hand, if the officers had sought a warrant, Defendant's neighbors undoubtedly would have been deprived of the quiet enjoyment of their homes for a significant period of time. To insist on a warrant under these circumstances would be to promote rigid formalities over important community interests and the legitimate privacy interests of Defendant's neighbors.

Moreover, although the Warrant Clause certainly is not irrelevant to the governmental intrusion at issue here, that clause nevertheless is implicated to a lesser degree when police officers act in their roles as "community caretakers." Because the Canton officers were not engaged in the "often competitive enterprise of ferreting out crime," *Johnson, supra*, 333 U.S. at 14, 68 S.Ct. at 369, there is less cause for concern that they might have rashly made an improper decision. Neither is it tenable to insist that, despite their community caretaking role, the officers must have established "probable cause," as that term is used in the context of criminal investigations, before they could enter Defendant's home. Based in part on this distinction between criminal investigations and other sorts of governmental intrusions, the Supreme Court has allowed administrative warrants to issue on something less than traditional probable cause, *see, e.g., Camara*, 387 U.S. at 537–38, 87 S.Ct. at 1735–36, and occasionally has dispensed altogether with the warrant requirement, *see, e.g., T.L.O.*, 469 U.S. at 340, 105 S.Ct. at 742; *Opperman*, 428 U.S. at 367–69, 96 S.Ct. at 3096–97, so long as a substantial governmental interest is being subserved. Having found that an important "community caretaking" interest motivated the officers' entry in this case, we conclude that their failure to obtain a warrant does not render that entry unlawful.[9]

---

8. Moreover, as discussed below, we believe that the officers' conduct after entering Defendant's home was entirely consistent with their claimed intent to locate and silence the loud music.

9. At oral argument, counsel for Defendant suggested that no state court judge would have been

willing to issue a warrant under the facts of this case. If this is so, it seems to undermine Defendant's claim that the warrantless entry here was improper. Surely we would be disingenuous, to say the least, in holding that the Canton officers acted unreasonably by failing to make a *futile* effort to obtain a warrant.

■ Most importantly, we find that the officers' decision to enter Defendant's home satisfies the standard of "reasonableness" that is the touchstone of the Fourth Amendment. Admittedly, the case law demonstrates that the Fourth Amendment's requirement of "reasonableness" is not susceptible of an entirely straightforward and commonsense construction. For reasons ranging from historical to pragmatic, courts have imbued the fundamental principle of "reasonableness" with various concepts such as the expectation of privacy, exigent circumstances, and the like. We acknowledge that these various conceptual devices might well be necessary to ensure that the underlying purposes of the Fourth Amendment are achieved under the myriad of circumstances confronting law enforcement personnel. Nevertheless, we believe that the judicial edifice erected upon that Amendment should not be allowed to obscure the essential requirement that police officers act reasonably when they intrude upon an individual's privacy.

In this case, we are simply unable to identify any unreasonable conduct on the part of the Canton police officers. When confronted with a loud disturbance in the middle of the night, the officers attempted to abate the nuisance through various measures short of entering Defendant's home, including repeated banging on Defendant's front door and tapping on his windows. When these initial efforts proved unavailing, and upon discovering that the back door to Defendant's home was open, they knocked, announced their presence, and entered the home in search of someone who might be able to turn down the blaring music. In our view, the officers properly escalated their efforts as each preceding measure failed to abate the noise. Indeed, if they had done otherwise, perhaps by leaving the scene to obtain a warrant, "we are convinced that citizens in the community would have understandably viewed the officers' actions as poor police work." *Murdock v. Stout*, 54 F.3d 1437, 1442 (9th Cir.1995). Quite clearly, nothing in the Fourth Amendment requires the police (and the neighbors) to idly observe and tolerate a late-night, ongoing nuisance to the community while a warrant is sought and obtained.

■ Defendant argues that the officers could have taken other measures short of entering his home, such as calling on the telephone or activating their squad car lights or siren. However, it is pure speculation whether any of these additional measures might have rendered the subsequent entry unnecessary; indeed, given the volume of the music emanating from Defendant's home, it seems doubtful that the sound of a siren or ringing telephone would have gained Defendant's attention. More to the point, we emphatically reject the notion that a warrantless entry is permissible only when all conceivable alternatives have been exhausted. Such a rule would require us to ignore the day-to-day and minute-to-minute demands upon police officers, and to instead evaluate their conduct under a standard established with the benefit of hindsight. *See United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir.1995) ("An officer on the beat must be allowed latitude to make snap judgments, subject to the requirement of reasonableness."); *cf. Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) (recognizing, in the context of warrantless arrests, the legitimacy of "a policeman's on-the-scene assessment of probable cause"). The Fourth Amendment does not mandate that police officers act flawlessly, but only that they act reasonably. *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990).

We do not lightly abrogate the constitutional presumption that police officers must

---

Alternatively, perhaps counsel for Defendant means to suggest that Defendant's late-night disturbance of his neighbors' peace was not sufficiently egregious to justify issuance of a warrant. The consequences that flow from this suggestion are clear: upon failing to gain Defendant's attention by banging on his door and windows and loudly announcing their presence, the Canton officers would have been utterly powerless to take any further action to quell the blaring music, and Defendant's neighbors, therefore, would have been forced to tolerate that disturbance indefinitely, perhaps for the rest of the night. If a warrant cannot be obtained under these circumstances, we can only conclude that the warrant mechanism is unsuited to the type of situation presented in this case.

secure a warrant before entering a private residence. In the end, however, we would find it extremely difficult to adjudge the conduct of the Canton police officers as "unreasonable" without pointing to *something* those officers should have done differently. Quite simply, we find nothing in the Fourth Amendment that leads us to disapprove of the officers' chosen course of action.[10] Accordingly, we find that the officers acted reasonably under the totality of the circumstances they faced, and we therefore hold that their warrantless entry into Defendant's home did not violate the Fourth Amendment.[11]

### C. Once the Officers Lawfully Entered Defendant's Home, They Were Entitled to Seize Any Evidence They Found in Plain View As They Sought To Quell the Loud Music.

Having determined that the Canton police officers lawfully entered Defendant's home, we need only briefly address the remaining issues on appeal. First, because the officers discovered the marijuana plants in plain view as they entered Defendant's basement, and because the incriminating nature of this evidence surely was apparent to the officers, they were entitled to seize the marijuana without first obtaining a warrant. *Horton v. California,* 496 U.S. 128, 141–42, 110 S.Ct. 2301, 2310–11, 110 L.Ed.2d 112 (1990).

At most, it could perhaps be argued that the officers exceeded the narrow purpose of their warrantless entry by looking in Defendant's basement despite their apparent awareness that the source of the loud music must have been located on the second floor.[12] *See United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994) (finding that a warrantless entry of a home to free a victim being held against her will could not lawfully be expanded to include a search of the home's closets). However, the officers testified at the suppression hearing that they preferred to search for an occupant who could turn down the music, rather than taking matters into their own hands by searching for the stereo and turning it down themselves. They further testified that, in their search for an occupant, they proceeded into Defendant's basement only upon observing that light was emerging from the open basement doorway. Given the lack of any response to their shouts and banging, and given the ongoing and blaring music, the officers could have logically surmised that someone was in the basement but had not heard them enter the house.

We find the officers' explanation entirely plausible, and their conduct entirely reasonable, especially in the absence of any evidence whatsoever suggesting that the officers entered or searched Defendant's home for the purpose of turning up evidence of criminal activity.[13] Consequently, we con-

**10.** Even if we were to conclude that the officers' warrantless entry violated the Fourth Amendment, it could be argued that the suppression of evidence would not be warranted under the facts of this case. Having determined that the officers acted reasonably, we do not believe that any legitimate deterrent function would be served by applying the exclusionary rule here. *Cf. United States v. Leon,* 468 U.S. 897, 918–19, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984) ("[E]ven assuming that the [exclusionary] rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.").

**11.** We wish to emphasize the fact-specific nature of this holding. By this decision, we do not mean to fashion a broad "nuisance abatement" exception to the general rule that warrantless entries into private homes are presumptively un-

reasonable. We simply find that, in some cases, it would serve no Fourth Amendment purpose to require that the police obtain a warrant before taking reasonable steps to abate an immediate, ongoing, and highly objectionable nuisance, and we conclude that this is just such a case.

**12.** We note that Defendant's brief on appeal does not discuss this point, but instead addresses only the more fundamental question of the legality of the officers' warrantless entry.

**13.** Indeed, even if the officers had come across the stereo before locating an occupant, it would arguably have been appropriate to continue looking around to determine whether, in light of the apparently unattended yet loud stereo, anyone might be in need of emergency assistance. *See Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (discussing the "emergency aid" exception to the warrant requirement). Of course, we need not decide this issue.

clude that the officers' discovery and seizure of the marijuana plants in Defendant's basement was justified under the "plain view" doctrine.

Finally, there remains the question whether the Canton police officers properly obtained Defendant's consent before searching his bedroom closet and discovering a sawed-off shotgun. Given its determination that the officers' initial entry was unlawful, the district court did not need to resolve this question. The Government contends, and Defendant does not dispute, that the district court merely suggested, but did not expressly hold, that Defendant might have lacked the capacity to consent to a search. Moreover, the record does not disclose any findings by the district court regarding the sequence of events surrounding the discovery of the shotgun. In light of this incomplete record, we order that this matter be remanded to the district court for the purpose of determining whether the officers discovered the shotgun in the closet only after Defendant had freely given his consent to a thorough search of his home.

### III. *CONCLUSION*

For the foregoing reasons, we conclude that the Canton police officers' warrantless entry into Defendant's home was justified by exigent circumstances, and that the officers' subsequent discovery of marijuana plants in Defendant's basement was justified under the "plain view" doctrine. Therefore, we reverse the decision of the district court to grant Defendant's motion to suppress. However, because we cannot resolve the issues surrounding Defendant's consent to a further search under the present record, we remand this matter for the district court's determination as to the legality of the subsequent search.

DAUGHTREY, Circuit Judge, dissenting.

At footnote eleven, the majority writes:

We wish to emphasize the fact-specific nature of this holding. By this decision, we do not mean to fashion a broad "nuisance abatement" exception to the general rule that warrantless entries into private homes are presumptively unreasonable.

As many a law professor has said, "Hard cases make bad law." It is precisely because of this opinion's far-reaching potential to undermine the sanctity of the home that I find that I must dissent.

The initial problem with the majority's opinion is its insistence that the Fourth Amendment's "reasonableness" clause dwarfs the warrant requirement. The majority hypothesizes that

based on the Amendment's division into two separate and apparently independent parts, the "Reasonableness" Clause and the "Warrant" Clause, one could posit that the officers' entry need only have been "reasonable," and that the absence of a warrant for their entry does not bear on this reasonableness inquiry.

Despite the majority's recognition that this approach is not "reconcilable with the prevailing judicial construction of the Fourth Amendment," the majority then constructs an entire opinion around its view that the "reasonableness" clause outstrips the warrant requirement. When the majority "decline[s] to read [the] Amendment's 'reasonableness' and warrant requirements as authorizing timely governmental responses only in cases involving life-threatening danger," it ignores Fourth Amendment jurisprudential principles that have been firmly established for years.

Fourth Amendment jurisprudence recognizes that the protection the warrant requirement provides against police overreaching and abuse must give way to true exigencies. Such circumstances include "hot pursuit of a fleeing felon," "imminent destruction of evidence," prevention of a suspect's escape, and risk of danger to the police or others. *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994). In all of these "exigent circumstances," however, a great deal of harm would likely result from any delay in police action, and courts have therefore recognized that warrants are unnecessary in these instances. Refusing to recognize the common denominator in these situations, the majority elevates the desire to turn down loud music to the status of "exigent circumstance."

The majority comments that

nothing would have been gained if a disinterested magistrate had independently evaluated the Canton officers' claim. * * * At most, a warrant could have specified the scope of a permissible entry, thereby ensuring that the officers' intrusion was narrowly tailored to the limited purpose of ascertaining the source of the loud music and quelling it.

Despite the fact that the majority seems to view as trifling the benefit of limiting a search, this function goes to the heart of the warrant requirement. Although an inconvenience, the warrant requirement protects our homes from the otherwise unchecked investigative authority of the police.

For these reasons, I cannot concur in an opinion that reduces the significance of the warrant requirement to this extent. I cannot find "exigent circumstances" in the neighbors' desire to quell the loud music emanating from the defendant's house. When mere nuisance abatement rises to the level of an "exigent circumstance," and the propriety of a search is judged by a *post facto* determination of the reasonableness of the search, the warrant requirement becomes a virtual nullity and the privacy interest in our homes exists only to the extent that our neighbors do not cry too loudly.