Peggy STRUTZ, Michael Strutz, and Stephanie Strutz, Plaintiffs,

v.

Oakland County Sheriff's Sergeant Dorothy HALL, Oakland County Sheriff's Deputy Lonnie Mullins, Oakland County Sheriff's Deputy Keith Christie, and Oakland County Sheriff's Department, Defendants.

No. 02–74407.

United States District Court, E.D. Michigan, Southern Division.

March 11, 2004.

Megan Bonanni, Esq., Royal Oak, MI, for plaintiffs.

Keith Lerminiaux, Esq., Pontiac, MI, for defendants.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiffs Peggy and Michael Strutz and their daughter Stephanie Strutz com-menced this suit in this Court on November 7, 2002, asserting federal constitutional claims under 42 U.S.C. § 1983 and various state-law tort claims arising from the warrantless forced entry into their home and the arrest of Peggy and Michael Strutz by the Defendant officers of the Defendant Oakland County Sheriff's Department. The officers were dispatched to Plaintiffs' home shortly before midnight on December 31, 2000 to investigate reports of a loud New Year's Eve party and possible underage drinking. Plaintiffs answered the door and responded to the Defendant officers' initial inquiries, but then refused to allow the officers to enter the premises and investigate further. The officers forced their way through the door, arrested Mr. and Mrs. Strutz following a scuffle in the entryway of the home, and then administered preliminary breath tests to Stephanie Strutz and several other minors on the premises to determine whether they had been drinking. In their complaint, Plaintiffs charge that the officers unlawfully entered their home, arrested Mr. and Mrs. Strutz without probable cause, employed excessive force in their encounters with the Strutz family, and committed various state-law torts.

By motion filed on June 30, 2003, Defendants now seek summary judgment in their favor on all of Plaintiffs' claims. In support of this motion, Defendants primarily contend that they lawfully entered Plaintiffs' home in the exercise of their "community caretaker" function, in order to verify the well-being of the minor children in the home. Having lawfully entered the home, Defendants maintain that their subsequent actions within the premises were justified, both in response to the obstructive behavior of Mr. and Mrs. Strutz and in light of their observation of minors who appeared to have been drinking. In a response filed on August 18, 2003, Plaintiffs challenge Defendants' ap-

peal to their "community caretaking" role, arguing that there was no justification for a warrantless entry into their home. Plaintiffs further contend that they have produced sufficient evidence regarding the conduct of the Defendant officers within the Strutz home to sustain a variety of claims under state and federal law. On September 11, 2003, Defendants filed a reply brief in further support of their motion.

The Court held a hearing on Defendants' motion on January 8, 2004. Having considered the arguments of counsel at this hearing, and having reviewed the parties' briefs and the other materials in the record, the Court now is prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL BACKGROUND*

The events surrounding Defendants' warrantless entry into Plaintiffs' home and the arrest of Peggy and Michael Strutz are disclosed with sufficient clarity in the deposition testimony of the parties. In the following account, the Court views this record in a light most favorable to Plaintiffs, as the non-moving parties.

### A. The New Year's Eve Gathering at Plaintiffs' Home

On the evening of December 31, 2000, Plaintiffs Peggy and Michael Strutz left their home at around 7:00 p.m., planning to celebrate New Year's Eve by going out to dinner and a movie. Their two teenaged children, Plaintiff Stephanie Strutz and Gary Strutz, remained at home, and were given permission by their parents to invite a few of their friends over to the house.[1] Before leaving, Mr. and Mrs. Strutz placed their liquor in a box in the basement, so that it could be accounted for on their return. Their plans called for them to return home shortly before midnight.

Apparently, word got out among the friends of Stephanie and Gary Strutz that their parents were out for the night. As a result, a number of uninvited teenagers arrived at the Strutz home over the course of the evening. Stephanie Strutz became concerned that the situation was beyond her control, with too many teenagers at her home and some who were drinking.[2] Accordingly, she paged her parents at the movie, and asked them to come home early to assist in restoring order.

Mr. and Mrs. Strutz returned home at around 11:30 p.m., and began to round up all of the teenagers in the house. Mr. Strutz asked if anyone had been drinking, and stated that he would take away the car keys of anyone who had been. Nobody admitted having done so, and Mr. Strutz testified that he neither saw any alcoholic beverages nor observed anyone who appeared to be intoxicated. Similarly, Mrs. Strutz testified that she did not detect any open alcoholic beverages in the house, and that the liquor she had set aside in the basement had not been touched. She further stated, however, that she "could smell that someone had beer or something on them." (Peggy Strutz Dep. at 6–7.) Nonetheless, within a few minutes after their arrival, Mr. and Mrs. Strutz believed that the situation at their home was under control.

### B. The Defendant Officers' Arrival at Plaintiffs' Residence

On the evening at issue here, December 31, 2000, Defendant Oakland County Sher-

---

1. Stephanie Strutz was 18 years old at the time, and her brother Gary was 17.

2. Of the teenagers who have been deposed and have admitted to drinking alcohol, most stated that they began drinking before arriving at the Strutz home, and several acknowledged that they brought beer into the house.

iff's Deputy Lonnie Mullins was on routine patrol in Independence Township when he received a call from dispatch concerning a report of a loud party with possible underage drinking. Deputy Mullins reported back to dispatch that he would respond to the scene. Defendant Oakland County Sheriff's Sergeant Dorothy Hall also heard the call from dispatch, and responded that she would travel to the scene to assist Deputy Mullins.

Deputy Mullins arrived at Plaintiffs' home at around 11:42 p.m., or about ten minutes after Mr. and Mrs. Strutz had returned to their residence. As he headed for the front door, Sergeant Hall and Defendant Oakland County Sheriff's Deputy Keith Christie arrived at the premises and joined Deputy Mullins on the front porch. Deputy Mullins testified that as he approached the front door of Plaintiffs' home, he observed a bottle of spiced rum on the porch, and saw several individuals running up the stairs to the second floor of the residence.

Deputy Mullins then knocked on the front door, and Mr. Strutz opened the door to address the officers. Deputy Mullins explained that a complaint had been made regarding a loud party with possible underage drinking, and Mr. Strutz reportedly responded that only he and his family were in the home.[3] According to Deputy Mullins and Sergeant Hall, Mr. Strutz stated that his children were allowed to consume alcohol within their own home, so long as Mr. Strutz gave them permission.

At this point, Mrs. Strutz came to the door and joined the conversation with the Defendant officers. Sergeant Hall testified that Mrs. Strutz "was being a little belligerent," (Hall Dep. at 21), and that the officers sought to assure her that they merely wished to check on the welfare of the children on the premises. According to Sergeant Hall, Mrs. Strutz initially stated that only her own children were at home.[4] When asked about the number of cars in the driveway, Mrs. Strutz reportedly responded that relatives were visiting from out of town.

Following this initial discussion, the officers sought permission to enter the premises. Mr. Strutz refused, stating that the situation was under control and that, so far as he knew, no minors had been drinking in his home. The officers then asked that the Strutz children be brought to the front door, and Mr. and Mrs. Strutz complied with this request. Sergeant Hall testified that she was standing near Stephanie Strutz, and detected the odor of alcohol from the girl. Similarly, Sergeant Hall and Deputy Mullins testified that Gary Strutz was standing about four feet away from them, and appeared to be intoxicated with flushed skin and glassy eyes. Beyond these observations, however, there is no testimony that the children exhibited any other signs of intoxication, such as staggering or slurred speech.

At this point, Sergeant Hall directed Deputy Christie to retrieve a preliminary breath test ("PBT") device from his patrol car, and informed Mr. and Mrs. Strutz that she planned to test their children to determine whether they had been drinking. Mr. Strutz responded that he would not permit his children to leave the house and submit to a PBT. Although the officers stated that they had probable cause to enter the premises because it appeared that minors had been drinking in the house, Mr. Strutz expressed his belief that a warrant was necessary in order to enter

---

3. Mr. Strutz has denied making any such statement, and instead testified that he told the officers that family and friends were present.

4. Again, Mrs. Strutz denies having made any such statement.

his home. He then shut the outer storm door to the premises, and began to close the inner, main door.

As Mr. Strutz attempted to close this inner door, the Defendant officers yanked open the storm door and pushed against the inner door. In the ensuing struggle at the front door, Mr. Strutz and Deputy Mullins fell to the floor, with the officer suffering a bloody nose in the process.[5] Deputy Christie then came to the assistance of Deputy Mullins, pepper spraying Mr. Strutz and placing him in handcuffs.

According to Mr. Strutz, he did not resist during this process, but merely asked that the handcuffs be loosened or adjusted in order to avoid painful contact with his wristwatch. The officers did not comply with this request. In addition, Mr. Strutz testified that he told the officers that "I'm not fighting you," but merely "want you out of my house" because "[y]ou have no reason to be in here." (Michael Strutz Dep. at 42.) To this, Deputy Mullins reportedly responded that "[y]ou don't have no rights, mother f* * *er." (*Id.*)

As all of this was occurring, Mrs. Strutz became agitated, screaming as the Defendant officers forced open the front door. Sergeant Hall grabbed Mrs. Strutz to keep her from interfering in the altercation between her husband and Deputy Mullins, and the two women slipped and fell on the wet floor of the foyer. As she struggled with Sergeant Hall on the floor, Mrs. Strutz was pepper sprayed by Deputy Christie. At some point during these scuffles, Stephanie Strutz attempted to come to the assistance of her mother and father, and in turn was also pepper sprayed by Deputy Christie.

Stephanie ran screaming toward the Strutz's kitchen, and Sergeant Hall allowed Mrs. Strutz to get up off the floor and assist her daughter. According to Mrs. Strutz, the pepper spray induced an asthma attack in Stephanie, and Mrs. Strutz picked up the telephone to seek emergency assistance for her daughter. Before she could make the call, however, Sergeant Hall told her to "get away from that god damn phone," called her a "white f* * *ing b* * * *," and struck her in the head with the phone. (Peggy Strutz Dep. at 23.)

Sergeant Hall then told Mrs. Strutz that her daughter Stephanie would be arrested for striking a police officer. Instead, however, the Defendant officers proceeded to arrest Mrs. Strutz, and placed her in handcuffs. Mrs. Strutz asked if she could be handcuffed in front, on account of her claustrophobia, but Sergeant Hall reportedly responded, "B* * * *, you think you have claustrophobia now? You're really going to have it when I'm done." (*Id.* at 27.) The Defendant officers ignored Mrs. Strutz's request, handcuffed her hands behind her back, threw her down on the ground, and kicked her in the legs. While Mrs. Strutz was lying handcuffed on the floor, she was once again pepper sprayed. The officers then led Mrs. Strutz outside to a squad car, ignoring her requests that she be allowed to pull down her shirt (which had been pulled up during her struggles with the officers) and to put on shoes. During this process, Sergeant Hall again called Mrs. Strutz a "white f* * *ing b* * *." (*Id.* at 29.)

Mrs. Strutz was placed in a squad car with the windows rolled up. She requested that one of the windows be opened slightly because it was warm in the car, but Deputy Mullins reportedly responded, "I think I'm cold today," turned up the

---

5. Although Deputy Mullins indicated in his initial incident report that his bloody nose was caused by Mr. Strutz's flailing arms, he acknowledged at his deposition that he might have suffered this injury when he became entangled with Mr. Strutz and fell to the floor.

heat in the car, and told Mrs. Strutz to "[s]uffer you're a* *." (*Id.* at 32.) Mrs. Strutz remained outside her home in the squad car for two hours, and then was taken to the Oakland County jail, booked, and held until eleven o'clock on New Year's morning.

Similarly, after Mr. Strutz was handcuffed, he was led out to a different patrol car, remained there for two to three hours, and was transported to the Oakland County jail for booking. When Mr. Strutz asked Deputy Mullins why he was being arrested, the officer responded that "we'll figure it out by the end of the night." (Michael Strutz Dep. at 49.) Mr. Strutz also was held overnight, and was released at the same time as his wife, when a former neighbor posted a bond for the couple.

After Mr. and Mrs. Strutz had been arrested and removed from their home, the Defendant officers, assisted by four additional officers, proceeded to search the Strutz home, round up fourteen teenagers, and administer PBTs to all of these teenagers. Several of these individuals have testified that Sergeant Hall used vulgar and racist language during this process. According to Plaintiffs, seven of the fourteen teenagers tested positive for alcohol, with blood-alcohol readings ranging from .007 to .11. Plaintiff Stephanie Strutz was tested, and recorded a reading of .035. Her brother Gary was not tested, however, apparently because he had left the home during the altercation between his parents and the Defendant officers. All seven teenagers who tested positive for alcohol, including Stephanie Strutz, were issued tickets for minor in possession offenses.

## C. Procedural Background

Michael and Peggy Strutz each were charged with one count of resisting and obstructing a police officer, a misdemeanor offense. A preliminary examination was conducted on March 12, 2001, with Sergeant Hall and Deputy Mullins testifying at this proceeding. At the conclusion of the examination, Oakland County District Judge Gerald E. McNally ordered Mr. and Mrs. Strutz bound over for trial.

On June 22, 2001, in response to a motion to quash filed by the criminal defense attorney for Mr. and Mrs. Strutz, Oakland County Circuit Judge Edward Sosnick issued an Opinion and Order granting the motion and quashing the bindover. In so ruling, Judge Sosnick held that the warrantless entry into the Strutz's home was unlawful, where the circumstances did not establish any of the recognized exceptions to the warrant requirement, and where the potential crime being investigated was a misdemeanor minor-in-possession offense. Judge Sosnick also rejected the prosecution's appeal to a police officer's community caretaker function, finding insufficient evidence that anyone inside the Strutz residence was in need of immediate aid, and observing that the officers were "specifically searching for evidence of a crime." (6/22/2001 Circuit Court Opinion and Order at 3.)

Plaintiffs Peggy, Michael, and Stephanie Strutz commenced the present suit on November 7, 2002, asserting a variety of state and federal claims against Sergeant Hall, Deputy Mullins, Deputy Christie, and the Oakland County Sheriff's Department.[6] Specifically, in their complaint, Plaintiffs

6. In the present motion, Defendants argue that there is no evidentiary basis for imposing liability on Oakland County or its Sheriff's Department under Plaintiffs' state or federal constitutional theories of recovery. Plaintiffs have conceded this point in their brief in response to Defendants' motion. As these constitutional claims are the only ones asserted against the County, the remainder of this Opinion addresses only the claims brought against the individual Defendant officers.

have advanced: (i) state-law tort claims of assault and battery, false arrest and imprisonment, malicious prosecution, abuse of process, and intentional infliction of emotional distress; (ii) claims under the Michigan Constitution;[7] and (iii) federal constitutional Fourth and Fourteenth Amendment claims of an illegal warrantless entry into Plaintiffs' home, excessive use of force, wrongful arrest, imprisonment, and prosecution of Peggy and Michael Strutz, and illegal seizure of Stephanie Strutz when the Defendant officers compelled her to take a preliminary breath test. Through their present motion, Defendants seek summary judgment in their favor on all of these claims, state and federal alike.

## III. *ANALYSIS*

### A. The Standards Governing Defendants' Motion

In the present motion, Defendants request an award of summary judgment in their favor on all of the federal and state-law claims asserted in Plaintiffs' complaint. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex*:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

Upon reviewing this trilogy of decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the

---

**7.** Again, Defendants contend in their motion that no such state constitutional theory of recovery is available here, and Plaintiffs have acknowledged this point in their response brief.

respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendants' motion.

**B. The State Circuit Court's Ruling Has No Preclusive Effect upon Any Claims or Issues in the Present Action.**

■ Before addressing the arguments presented in Defendants' motion, the Court first must resolve a threshold issue raised in Plaintiffs' response to this motion. Specifically, Plaintiffs contend that Defendants are barred under the doctrine of collateral estoppel[8] from relitigating the lawfulness of their entry into the Strutz residence on the evening in question, where the Oakland County Circuit Court already has ruled that this warrantless entry was improper. As Defendants correctly point out in their reply brief and in a supplemental submission, the doctrine of collateral estoppel does not apply here.

Under well-established principles, this Court must apply Michigan's law of collateral estoppel in order to determine the preclusive effect of the Oakland County Circuit Court's ruling upon Plaintiffs' § 1983 claims in this action. *See, e.g., Darrah v. City of Oak Park,* 255 F.3d 301, 311 (6th Cir.2001); *Glass v. Abbo,* 284 F.Supp.2d 700, 705 (E.D.Mich.2003). "Under Michigan law, issue preclusion applies when 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Darrah,* 255 F.3d at 311.

As the courts have recognized under analogous circumstances, at least two of these four prerequisites are lacking here. First, the issue presented here is not precisely the same as the question decided by the Michigan court. In deciding whether the criminal prosecution could go forward against Peggy and Michael Strutz, the state Circuit Court was called upon to determine the lawfulness of the warrantless police entry that led to the Strutz's arrest. Although that question also is relevant here, Defendants' assertion of a qualified immunity defense results in a slightly different inquiry—specifically, this Court must decide whether an objectively reasonable officer in Defendants' position could have believed it permissible to enter Plaintiffs' home without a warrant. This lack of exact identity of issues precludes the application of collateral estoppel here. *See, e.g., Kegler v. City of Livonia,* 173 F.3d 429, 1999 WL 133110, at *2 n. 2 (6th Cir. Feb.23, 1999); *Ireland v. Tunis,* 907 F.Supp. 1088, 1104 n. 12 (E.D.Mich.1995), *aff'd,* 113 F.3d 1435 (6th Cir.1997).

Next, and more importantly, the requisite identity of parties is absent here. In several prior decisions within this Circuit, the courts have held that the defendant police officers in a § 1983 action could not be deemed parties to or in privity with the parties to a prior state-court criminal case.

---

**8.** This doctrine also is referred to as issue preclusion, and the Court uses these terms interchangeably here.

See, e.g., Von Herbert v. City of St. Clair Shores, 2003 WL 1194304, at *2 n. 1 (6th Cir. Mar.11, 2003); Kegler, 1999 WL 133110, at *2 n. 2; Glass, 284 F.Supp.2d at 705. Among the grounds cited in support of this conclusion, the courts have reasoned that police officers lack a personal stake in the outcome of a criminal prosecution, and thus do not have an incentive or opportunity to fully and fairly litigate any issues concerning their conduct during the course of such a proceeding. See Glass, 284 F.Supp.2d at 705. The same holds true here. Consequently, the Court finds that the rulings of the Oakland County Circuit Court in the criminal prosecution of Peggy and Michael Strutz have no preclusive effect in this action.

**C. The Record Does Not Demonstrate as a Matter of Law that the Defendant Officers Were Performing a Community Caretaking Function When They Entered Plaintiffs' Home Without a Warrant.**

As acknowledged by Plaintiffs and Defendants alike, the viability of Plaintiffs' various claims in this case depends in large measure upon the legality of the Defendant officers' initial entry into Plaintiffs' home. If this warrantless entry was proper, much of what ensued can be more readily justified. These proffered justifications are greatly diminished in force, however, if the Defendant officers lacked any lawful basis to enter Plaintiffs' home in the first instance. Hence, the parties have devoted significant portions of their briefs to a debate over the legal propriety of this initial entry.

■ It is a fundamental tenet of Fourth Amendment jurisprudence that "searches and seizures inside a home without a warrant are presumptively unreasonable." United States v. Rohrig, 98 F.3d 1506, 1513 (6th Cir.1996) (quoting Payton v. New York, 445 U.S. 573, 586, 100 S.Ct.

1371, 1380, 63 L.Ed.2d 639 (1980)). "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and "the warrant procedure minimizes the danger of needless intrusions of that sort." Payton, 445 U.S. at 585–86, 100 S.Ct. at 1379–80 (internal quotations, citation, and footnote omitted). Absent a warrant, only "exigent circumstances" may justify governmental entry into a private home. See Payton, 445 U.S. at 590, 100 S.Ct. at 1382; Rohrig, 98 F.3d at 1515.

Here, it is undisputed that Defendants lacked any sort of warrant, whether to arrest anyone within the Strutz household or to search any portion of the premises. Nor does this case fit comfortably within the four traditional categories of exigent circumstances recognized in the case law: (i) hot pursuit of a fleeing felon; (ii) imminent destruction of evidence; (iii) the need to prevent a suspect's escape; and (iv) a risk of danger to the police or others. Rohrig, 98 F.3d at 1515. In apparent recognition of this considerable obstacle, Defendants appeal to the role of the police as "community caretakers," as distinct from their more traditional law enforcement role.

As noted by Defendants, the Sixth Circuit addressed this "community caretaker" function at considerable length in Rohrig. In that case, the police responded to a complaint of loud noise emanating from a private residence in the wee hours of the morning. Upon approaching the home at around 1:30 a.m., the officers heard loud music a full block away from the premises, and were greeted by several pajama-clad neighbors who had emerged from their houses to complain of the noise. The officers banged repeatedly on the front door of the residence, tapped on all of its first-story windows, and knocked and announced their presence at an unlocked and

open back door, all without receiving any sort of response. Accordingly, the officers passed through the back door and into the residence, for the stated and limited purpose of locating either the source of the noise or an occupant who could quell the disturbance. Before finding either the source of the loud music or the defendant, however, the officers discovered wall-to-wall marijuana plants being cultivated in the basement.

The Sixth Circuit recognized that "none of the traditionally recognized exigent circumstances is squarely presented under the facts of this case." *Rohrig*, 98 F.3d at 1519. Nonetheless, the Court held that exigent circumstances justified the warrantless entry in that case, based in part upon the "community caretaker" function the officers were performing as they entered the defendant's residence:

> [T]he officers here did not enter a private home for the purpose of questioning a suspect or searching for evidence of a suspected offense . . . .
>
> Rather, by entering Defendant's residence for the limited purpose of locating and abating a nuisance, the officers sought to restore the neighbors' peaceful enjoyment of their homes and neighborhood. In view of the importance of preserving our communities, we do not think that this interest is so insignificant that it can never serve as justification for a warrantless entry into a home . . . .
>
> * * * * * *
>
> [A]lthough the Warrant Clause certainly is not irrelevant to the governmental intrusion at issue here, that clause nevertheless is implicated to a lesser degree when police officers act in their roles as "community caretakers." Because the . . . officers were not engaged in the often competitive enterprise of ferreting out crime, there is less cause for concern that they might have rashly made an improper decision. Nei-

ther is it tenable to insist that, despite their community caretaking role, the officers must have established "probable cause," as that term is used in the context of criminal investigations, before they could enter Defendant's home. Based in part on this distinction between criminal investigations and other sorts of governmental intrusions, the Supreme Court has allowed administrative warrants to issue on something less than traditional probable cause, and occasionally has dispensed altogether with the warrant requirement, so long as a substantial governmental interest is being subserved. Having found that an important "community caretaking" interest motivated the officers' entry in this case, we conclude that their failure to obtain a warrant does not render that entry unlawful.

98 F.3d at 1521–23 (internal quotations, citations, and footnote omitted).

In this case, Defendants maintain that their conduct in entering Plaintiffs' home is wholly analogous to the officers' actions in *Rohrig*. Specifically, they contend that they entered the home solely in their role as "community caretakers," to ensure the well-being of minors who, upon being brought to the front door of the house, appeared to exhibit signs of intoxication. When Mr. Strutz attempted to close the door on the officers in the face of their request to ascertain the welfare of his children, Defendants argue that they were entitled to respond to this effort to thwart a legitimate and important community caretaking function. This need for action was all the more compelling, in Defendants' view, because of the allegedly misleading representations by Mr. and Mrs. Strutz regarding the number of teenagers present in the home, and because of Mr. Strutz's purported comment that his children were allowed to drink in the family home so long as he gave his permission.

More generally, Defendants note that the governmental interest being served here, directed at the perils of underage drinking and the possibly life-threatening effects of excessive alcohol use, surely is more compelling than the loud noise and public disturbance concerns that drove the officers in *Rohrig* to enter a home without a warrant.

■ Upon careful consideration, however, the Court finds that Defendants' appeal to their "community caretaking" role fails at the very threshold, at least so far as can be determined as a matter of law under the present record. The lynchpin of any effort to rely upon a "community caretaker" justification for a warrantless entry is that the governmental action in question must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). Such was the case in *Rohrig*, where the officers entered the defendant's residence without any intent to investigate a suspected criminal violation or any expectation that they might discover evidence of such a violation. Instead, they merely sought to quell an ongoing and highly objectionable nuisance that was disturbing the neighborhood peace in the middle of the night. *Compare United States v. Williams*, 354 F.3d 497, 507–08 (6th Cir.2003) (distinguishing *Rohrig* on the ground that, in the present case, "the agents' motives in entering were arguably not as pure," but instead rested in part upon suspicions of drug-related activity within the premises).

Matters are far different here, at least under the evidence as viewed most favorably to Plaintiffs. First, while Defendants maintain that their sole purpose in seeking entry into the home was to check upon the well-being of the children on the premises, the deposition testimony of Michael Strutz on this point casts this claim in a somewhat different light. According to Mr. Strutz, the Defendant officers requested that his children come out of the house or that the officers be let in so that they could administer a preliminary breath test ("PBT") to the children. There is no mention in his testimony of a more generalized concern for the safety and well-being of his children. This testimony is corroborated to some extent through the testimony of Sergeant Hall that she asked Deputy Christie to retrieve a PBT device from one of the patrol cars, and that she then informed Mr. and Mrs. Strutz that she wished to test their children to determine whether they had been drinking.

There is an important distinction, in the Court's view, between checking to see whether an individual might need medical attention or might otherwise be in need of emergency assistance, on one hand, and performing a test designed to disclose whether a teenager has been drinking, on the other hand. Simply stated, the former course of action does not entail the "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady*, 413 U.S. at 441, 93 S.Ct. at 2528, while the latter surely can lead to evidence of such a violation. This distinction is confirmed by the facts of this very case, where PBTs were administered to each and every teenager found on the premises following Defendants' warrantless entry, and where citations were issued to all seven teenagers who tested positive for the presence of alcohol in their systems.

To be sure, the Court recognizes that a PBT can be administered in a fashion that is compatible with a purely "community caretaking" role. It is possible, for example, that such a test could provide important information as to the extent of alcohol consumption, and could alert an officer to

the need to take prompt action against an imminent threat of alcohol poisoning or other severe consequences of excessive drinking. Presumably, however, a PBT is not the *only* means through which an individual's need for medical attention may be ascertained—slurred speech and difficulty in walking or standing surely would be additional indications of a need for intervention. Yet, the record here fails to reflect that the Defendant officers pursued any such less intrusive measures that would not entail entry into Plaintiffs' home, beyond merely asking that Stephanie and Gary Strutz be brought to the front door for a visual inspection.

■ Notably, Mr. and Mrs. Strutz voluntarily complied with this request, thereby providing an opportunity for Defendants to ensure the well-being of the children. Although Defendants have testified to their belief that the children showed some signs of intoxication, this testimony does not establish as a matter of law that the children's appearance gave rise to a legitimate and immediate concern for their safety and welfare. Without in any way diminishing the substantial threat posed by underage drinking, alcohol is not such an inherently dangerous substance that minors who are suspected of having consumed it are in immediate need of medical attention, even in the face of the contrary assessment and assurances of their own parents. Indeed, Defendants implicitly acknowledge as much, stating only that the children's appearance triggered a desire to administer PBTs. Under this record, it must be left to the trier of fact to determine whether Defendants sought only to ensure the welfare of the children, or whether they also sought to achieve law enforcement objectives.

Other considerations serve to further distinguish this case from *Rohrig*. As observed in *Payton*, the "zone of privacy"

protected by the Fourth Amendment is nowhere "more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton*, 445 U.S. at 589, 100 S.Ct. at 1381–82. Although *Rohrig* involved a warrantless home entry, the Sixth Circuit emphasized that the defendant in that case could not "claim the degree of privacy protection that generally attaches to private dwellings," where he had "undermined his right to be left alone by projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace." *Rohrig*, 98 F.3d at 1522. Indeed, upon arriving at the defendant's home, the police were greeted by several pajama-clad neighbors complaining of the disturbance, and the officers' efforts to rouse a resident from outside the home proved unavailing. Under these circumstances, the Court reasoned that it could not "protect [the defendant's] interest in maintaining the privacy of his home without diminishing his neighbors' interests in maintaining the privacy of *their* homes." 98 F.3d at 1522. The defendant's "substantially weakened" privacy interest played a crucial role in *Rohrig's* analysis. 98 F.3d at 1522.

Here, in contrast, Plaintiffs cannot be said to have surrendered their right to be left alone in their own home, at least not to the extent of the defendant in *Rohrig*. Defendants concede that any loud noise had abated by the time they arrived at the home, and that Plaintiffs were not projecting any sort of disturbance beyond the four corners of their property. In addition, upon their arrival, the officers were greeted at the door by Mr. Strutz, who assured them that the situation was under control and that, to his knowledge, no minors had been drinking in his home. Then, after answering the officers' initial inquiries, Mr. Strutz expressly asserted his constitutional protection against warrant-

less entries into his home, and insisted that Defendants secure a warrant before they could enter or remove his children. None of these actions could be viewed as significantly diminishing the Strutz's reasonable expectation of privacy in their own home.

To be sure, the officers had some basis for questioning Mr. Strutz's assurances that the situation in his home was under control. Deputy Mullins reportedly observed, for example, that several individuals had run up the stairs as he approached the front door of the residence, and there were a number of cars parked at or near the home. In addition, the officers had some reason to doubt Mr. Strutz's assertion that no minors had been drinking in his home, based on their observation that the Strutz children showed signs of intoxication—and, of course, it turned out that several teenagers found on the premises had consumed alcohol at some point during the evening. Nonetheless, from their vantage point in the open doorway, the officers did not observe any chaos, tumult, or ongoing illegal activities. Though the Court's analysis might well be different in the face of a continuing disturbance or evident underage drinking, particularly by teenaged guests as opposed to a household's own children, the Court cannot say as a matter of law under the present record that Plaintiffs had substantially diminished their presumptive Fourth Amendment right to privacy in their own home.

This brings the Court to one final distinction between this case and *Rohrig*. The need for immediate action in *Rohrig* was considerable, given the late hour and the presence on the scene of irate neighbors. In the view of the Court, the "police officers undoubtedly confronted a situation in which time was of the essence." *Rohrig*, 98 F.3d at 1521. "Had the officers attempted to secure a warrant, it is clear that the aural assault emanating from [the

defendant's] home would have continued unabated for a significant period of time." 98 F.3d at 1521.

Here, by contrast, any loud noise or community disturbance had already abated before Defendants arrived at Plaintiffs' home. Similarly, nothing that the officers actually witnessed at the scene suggested a need to act without delay. The Court fully recognizes the need to thoroughly and vigorously investigate reports of underage drinking, and readily acknowledges that the police need not accept a homeowner's self-serving assurances as the last word on the subject. Nonetheless, under the record presently before the Court, it cannot be said as a matter of law that it would have been impractical to secure a warrant before entering Plaintiffs' residence. For all of these reasons, therefore, the Court finds that *Rohrig* does not compel an award of summary judgment in Defendants' favor with regard to the warrantless entry into Plaintiffs' home.

### D. Defendants Have Not Identified Any Other Exigent Circumstances Which Would Justify Their Warrantless Entry as a Matter of Law.

In their response to Defendants' motion, Plaintiffs reasonably construe Defendants' initial brief as appealing solely to a *Rohrig*-based "community caretaker" justification for the warrantless entry into Plaintiffs' home. In their reply brief, however, Defendants suggest that their entry also could be justified by other exigent circumstances. Whatever these might be—and Defendants are not altogether clear on this point—the Court readily concludes that the record does not establish as a matter of law the presence of any such exigency.

In maintaining otherwise, Defendants first contend that they were authorized to enter the house "to arrest Stephanie Strutz for a misdemeanor committed in

their presence." (Defendants' Reply Br. at 4.) Through this argument, Defendants presumably mean to appeal to the Michigan statute which ·authorizes warrantless arrests for misdemeanors "committed in the peace officer's presence." Mich. Comp. Laws § 764.15. The offense for which Stephanie Strutz ultimately was ticketed, being a minor who purchases, consumes, or possesses alcoholic beverages, is deemed a misdemeanor under Michigan law. *See* Mich. Comp. Laws § ·436.1703(1). Defendants apparently take the position, then, that Stephanie Strutz "committed" this offense in their presence by appearing before them in the open doorway of the Strutz home and showing signs of alcohol consumption.

█ The Court need not decide whether any such offense was committed in Defendants' presence, because this would not aid Defendants' effort to justify their warrantless entry into the Strutz residence. The additional authority conferred by statute when an offense is committed in an officer's presence is the power to make a warrantless *arrest*—it is *not* the wholly distinct power to *enter a private home* without a warrant, whether to effect an arrest or for· some other purpose. This distinction is evident from the ruling in *Payton, supra,* in which the Court struck down a New York law which authorized police officers to enter private residences without a warrant to make routine felony arrests.

Indeed, the fallacy in Defendants' argument is revealed by comparing the facts here against those in one of the two companion cases before the Court in *Payton.* In that case, defendant Obie Riddick was wanted on suspicion of having committed two armed robberies, and the police subsequently learned his address and traveled to this location in order to arrest him. Without first obtaining a warrant, they knocked on the door of the home, and his young son answered. From the open doorway, ..the officers could see Riddick sitting· inside on a bed, and they entered the home and ·placed him · under arrest. The Supreme Court reversed Riddick's conviction, holding that the officers' entry into his home without a warrant was unlawful.

In light of *Payton,* it is difficult to see how Defendants' purported· authority ·to arrest Stephanie Strutz could have carried with it the distinct and additional authority to enter Plaintiffs' home in order to effect this arrest. By virtue of Stephanie Strutz's appearance at the doorway of her home, and the apparent odor of alcohol on her person, Defendants at best ˙obtained probable cause to arrest her on suspicion· of being a minor in possession of alcohol. This would have placed Defendants in precisely the same position as the officers in *Payton,* who had probable cause to arrest Obie Riddick on suspicion of armed robbery. It follows that the officers here, like the officers in *Payton,* could not rely on probable cause alone to make a warrantless entry into a private home. Nor does it matter that the officers here, as in *Payton,* could plainly see that the suspect was in the home at the time. Absent a warrant or exigent circumstances, the officers could not lawfully enter the home in order to place the suspect under arrest.

█ Indeed, Defendants here face an additional obstacle in .justifying their warrantless entry, in light of the minor nature of the offense that Stephanie Strutz was suspected of committing. In *Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S.Ct. 2091, 2099, 80 L.Ed.2d 732 (1984), the Supreme Court held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." .In that case, ·petitioner · Edward G. Welsh was observed

driving erratically, and his vehicle eventually swerved off the road and into a field. A passing driver witnessed the incident, and positioned his truck to block Welsh's car from returning to the road. Welsh then emerged from his vehicle and walked away from the scene, traveling on foot to his home a short distance away.

Upon arriving at the scene, a police officer learned what had happened and, using registration information from the abandoned vehicle, determined that Welsh lived nearby. Without securing a warrant, the police went to Welsh's home, and gained entry when his stepdaughter answered the door. Proceeding upstairs, the police found Welsh lying in bed, and placed him under arrest for operating a motor vehicle under the influence of an intoxicant. At the time, the applicable state statute provided that a first offense of driving under the influence was a noncriminal violation punishable by a maximum fine of $200. In subsequent state court proceedings, the Supreme Court of Wisconsin held that the warrantless entry into Welsh's home was justified by the exigent circumstances of hot pursuit, the need to prevent harm to the offender and the public, and the need to prevent destruction of evidence.

The Supreme Court reversed this ruling, and held, as noted above, that the minor nature of the offense is an important factor to consider in an exigent circumstances inquiry. More generally, the Court cautioned that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." *Welsh*, 466 U.S. at 753, 104 S.Ct. at 2099. The Court then stated:

> Application of this principle to the facts of the present case is relatively straightforward. The petitioner was ar-

rested in the privacy of his own bedroom for a noncriminal, traffic offense. The State attempts to justify the arrest by relying on the hot-pursuit doctrine, on the threat to public safety, and on the need to preserve evidence of the petitioner's blood-alcohol level. On the facts of this case, however, the claim of hot pursuit is unconvincing because there *was no immediate or continuous pursuit* of the petitioner from the scene of a crime. Moreover, because the petitioner had already arrived home, and had abandoned his car at the scene of the accident, there was little remaining threat to the public safety. Hence, the only potential emergency claimed by the State was the need to ascertain the petitioner's blood-alcohol level.

> Even assuming, however, that the underlying facts would support a finding of this exigent circumstance, mere similarity to other cases involving the imminent destruction of evidence is not sufficient. The State of Wisconsin has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible. This is the best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest. Given this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant. To allow a warrantless home entry on these facts would be to approve unreasonable police behavior that the principles of the Fourth Amendment will not sanction.

*Welsh*, 466 U.S. at 753–54, 104 S.Ct. at 2099–2100 (citations and footnote omitted); *see also People v. Reinhardt*, 141 Mich. App. 173, 366 N.W.2d 245, 248 (1985)

(holding, as a matter of Michigan statutory law, that "a police officer is not authorized to enter a private home without consent to make a warrantless misdemeanor arrest").

Taken together, *Payton* and *Welsh* pose a nearly insurmountable obstacle to Defendants' warrantless entry in this case. Even with probable cause to believe that an offense has been committed, *Payton* teaches that a warrant is presumptively necessary in order to enter a home and place a suspect under arrest. Although this warrant requirement may be overcome by exigent circumstances, *Welsh* instructs that such emergency situations are quite rare where the underlying offense at issue is minor in nature. Here, the only possible exigency posited by Defendants was their need as community caretakers to determine whether any minor children in the Strutz household were in need of immediate medical attention. As explained earlier, however, issues of fact remain as to whether Defendants may validly appeal to this community caretaker function. From all of this, the Court finds that the case for a warrantless entry here is not in any way aided by Defendants' belief that they had probable cause to arrest Stephanie Strutz for a misdemeanor minor-in-possession offense.

▪ Nor can the Court accept Defendants' suggestion that Plaintiffs somehow diminished their expectation of privacy in their own home by voluntarily responding to the officers' knock on their door and making themselves available for inspection and inquiry in the front entryway. Initially, it must be noted that both *Payton* and *Welsh* involved circumstances where a resident of a home voluntarily opened the door, and yet the Supreme Court did not weigh this as a factor in determining the lawfulness of the warrantless entries in those cases. Nor, as discussed earlier, does *Rohrig* assist Defendants on this point, because the Court there noted that

the defendant had, in effect, ventured outside the boundaries of his own home, and thus diminished any reasonable expectation of privacy, "by projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace." *Rohrig,* 98 F.3d at 1522. Plaintiffs here posed no similar threat to their surrounding community— any mischief or exigency was confined within the four walls of their home.

Indeed, it would be a strange rule that an individual would substantially diminish his constitutional protections in his own home by answering the knock of a police officer and cooperatively responding to the officer's inquiries. It is true, as illustrated in the cases cited by Defendants, that an individual who opens a door in such circumstances exposes all that can be seen from the doorway to public view, and thus surrenders his expectation of privacy in such publicly visible items. *See, e.g., McKinnon v. Carr,* 103 F.3d 934, 935–36 (10th Cir.1996); *United States v. Vaneaton,* 49 F.3d 1423, 1426–27 (9th Cir.1995). In this case, therefore, Defendants were entitled to use and rely upon whatever they saw or learned from the doorway of Plaintiffs' home as a basis for seeking a warrant, making arrests, conducting a search, or pursuing any other appropriate law enforcement objectives.

What Defendants could not do, however—at least in the absence of exigent circumstances—was to forcibly overcome Mr. Strutz's insistence that the police could not proceed past the threshold of his home without a warrant. The cases cited by Defendants draw precisely this distinction. In *Vaneaton,* for example, the Court emphasized that "[n]o threats or force were used by the police to get [the defendant] to open the door," that "[t]he police did not enter the house until they formally placed [the defendant] under arrest," and that "no

coercion was used by the police." *Vaneaton,* 49 F.3d at 1427. Similarly, in *McKinnon,* the Court observed that the officers "neither displayed nor threatened violence," and that the defendant "had acknowledged their authority by asking if he could dress" before being taken away. *McKinnon,* 103 F.3d at 935–36.

If Defendants here had been able to achieve their objectives without force, Plaintiffs could not have protested the absence of a warrant. When Mr. Strutz asserted his Fourth Amendment right to keep Defendants outside his house, however, the police were obliged to obtain a warrant or identify an exigent circumstance before they could use force to overcome Mr. Strutz's effort to close the door. Consequently, the Court cannot accept Defendants' argument that their warrantless entry into Plaintiffs' home was justified by Mr. Strutz's preceding decision to open the door and respond to Defendants' initial inquiries.[9]

### E. The Present Record Fails to Establish Defendants' Entitlement to Qualified Immunity.

Alternatively, in the event that the Court does not accept their contention that their warrantless entry was justified as a matter of law, Defendants argue that they enjoy qualified immunity from liability for this entry because their conduct was objectively reasonable. Once again, however, the Court finds that outstanding issues of fact preclude any such determination as a matter of law at this juncture.

Under well-established principles, this Court's qualified immunity inquiry entails two questions:

> First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. If the court finds a constitutional violation, it must then consider whether the violation involves clearly established constitutional rights of which a reasonable person would have known.

*Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir.2002) (internal quotations and citations omitted). The Court already has answered the first question in the affirmative, finding that the record viewed most favorably to Plaintiffs establishes a illegal warrantless entry into a private home in violation of the Fourth Amendment. The dispositive inquiry, then, is whether this violation would have been apparent to a reasonable officer in Defendants' position in light of the clearly established law at the time. *See Burchett,* 310 F.3d at 942.

---

**9.** Certain of Defendants' additional arguments in their motion, including their claim of probable cause to arrest Mr. and Mrs. Strutz and their challenge to Plaintiffs' claims of excessive force, rest to some degree upon the threshold premise that Defendants lawfully entered Plaintiffs' home despite the absence of a warrant.. Regarding the issue of probable cause to arrest, for example, Plaintiffs point out that the offense for which Mr. and Mrs. Strutz were arrested, resisting and obstructing a police officer, has as one of its elements that "the officer must have been carrying out lawful duties." *People v. Simpson,* 207 Mich.App. 560, 526 N.W.2d 33, 35 (1994). Similarly, Plaintiffs' claims of excessive force turn to some extent on the question whether they were actively resisting lawful attempts to arrest them, *see, e.g., Bass v. Robinson,* 167 F.3d 1041, 1045 (6th Cir.1999), or instead were merely resisting Defendants' unlawful efforts to enter their home without a warrant.

Having found that issues of fact remain as to the legality of Defendants' warrantless entry, the Court necessarily rejects all of Defendants' arguments that depend upon the initial premise of a lawful entry. Further, the Court readily concludes that additional issues of fact remain as to Plaintiffs' excessive force claims, where Plaintiffs have testified that Defendants employed gratuitous force at several points, including pepper spray, kicks, and overly tight handcuffing.

**785**

Certain relevant legal principles clearly were well-established at the time of the conduct at issue here. First, it was apparent from *Payton* and its progeny that warrantless entries into a private home are presumptively illegal, absent exigent circumstances. Further, *Welsh* had established that any exigent circumstances inquiry must consider the minor nature of the offense that an officer is investigating or for which an arrest is sought. More generally, *Welsh* held that the exigent-circumstances exception to the warrant requirement should only rarely be invoked in cases involving a minor offense.

■ The question becomes, then, whether a reasonable officer in Defendants' position should have known that the facts of this case did not present such a rare situation that a warrantless entry was justified. Stated differently, the Court must decide whether the circumstances confronting the Defendant officers outside Plaintiffs' home could have led to the reasonable conclusion, even if mistaken, that an exigency existed that would excuse the lack of a warrant. Although the Court views this as a somewhat close question, it finds that the record viewed most favorably to Plaintiffs defeats Defendants' appeal to qualified immunity.

As discussed above, and as Defendants themselves recognize, the "community caretaker" rationale of *Rohrig* offers the most promise of aiding Defendants in identifying an exigency here. To the extent that the circumstances reasonably suggested to Defendants that minors were drinking within the Strutz residence, it clearly was an appropriate community caretaking function for the officers to investigate whether any of the teenagers on the premises might have consumed so much alcohol that they were in need of immediate medical attention. Moreover, it appears that Defendants took some steps in this regard, asking Mr. and Mrs. Strutz to bring their children into the front entryway of the home so that the officers could check on their condition. If these initial measures had disclosed that Stephanie or Gary Strutz required emergency medical aid, or if the officers had seen something else from the doorway that evidenced a similar need—*e.g.*, liquor bottles strewn about or a teenager lying on the floor—Defendants clearly could have taken further action, including entry into the house if necessary.

As noted earlier, however, the evidentiary record is a good deal more equivocal. Upon visually inspecting the Strutz children and determining that they showed signs of alcohol consumption, the very next steps taken by the Defendant officers were directed at administering PBTs to ascertain the extent of this apparent consumption. Although, as explained earlier, this effort was not necessarily incompatible with the "community caretaker" function of assessing the well-being of the children, it was also compatible with the law enforcement objective of determining whether Stephanie or Gary Strutz had committed a minor-in-possession offense. Moreover, as discussed above, there are some surrounding indicia in the record that Defendants acted, at least in part, out of a desire to investigate the possibility of criminal wrongdoing. These outstanding questions of fact as to motive already have led the Court to conclude that the "community caretaker" rationale of *Rohrig* does not apply here as a matter of law. And, of course, it is worth noting that Judge Sosnick reached precisely the same conclusion in dismissing the charges against Mr. and Mrs. Strutz.

More importantly, because of the sequence of measures Defendants elected to employ, their initial investigation simply failed to disclose that anyone in the Strutz residence was, in fact, in need of medical or other emergency assistance. Their inquiries and inspection revealed, at most,

that the Strutz children might well have been drinking, but that they were still capable of complying with Defendants' request that they present themselves in the entryway of the home. Beyond this, Defendants had reason to believe that other teenagers were present, and they also apparently had some question about the truthfulness of Mr. and Mrs. Strutz's responses regarding the number of visitors in their home. Yet, rather than following up on these concerns, the officers sought permission to enter the home for the purpose of administering PBTs to Stephanie and Gary Strutz.

Under these circumstances, the Court is unwilling to conclude that enough facts had been uncovered to support a reasonable officer's conclusion that a warrantless entry was justified. In any case where police respond to a complaint of possible underage drinking at a private residence, there will be at least some basis for concern that a minor might have consumed enough alcohol to require medical attention. This Court is reluctant to hold, however, that such a situation invariably presents an exigency that permits a warrantless entry over the objection of the homeowner. The situation here is not much different—the only additional information Defendants gleaned upon arriving at the residence was (i) apparent confirmation that others were in the house, beyond just the members of the immediate Strutz family, and (ii) some indication that

the two Strutz children, at least, showed signs that they had been drinking. These additional facts do not transform the situation from one of garden-variety illegality to one in which an emergency response is required.

Absent any such exceptional circumstances or concrete indications of a need for immediate intervention, a reasonable officer in Defendants' position could not have concluded that this is one of the rare cases in which a warrantless entry is justified despite the minor nature of the suspected offense. Accordingly, the Court finds that Defendants are not entitled to qualified immunity from liability for their warrantless entry into Plaintiffs' home.

## F. Plaintiffs' State Law Claims

Finally, Defendants seek summary judgment in their favor on Plaintiffs' various state law claims.[10] With certain exceptions, however, Defendants' challenges to these claims are defeated on the same grounds as set forth in the Court's analysis of Plaintiffs' federal constitutional claims.

First, Defendants argue that Plaintiffs' claims of false arrest and false imprisonment fail in light of the probable cause that existed to arrest Plaintiffs. As noted earlier, however, if Defendants lacked a lawful basis to enter Plaintiffs' home without a warrant, it follows that they would have lacked probable cause to arrest Mr. and Mrs. Strutz for the offense of resisting and obstructing an officer.[11] Consequent-

---

10. As noted earlier, Plaintiffs concede that they cannot go forward on their claims under the Michigan Constitution. Thus, the Court need not address these claims.

11. It is not clear whether Plaintiff Stephanie Strutz seeks to pursue claims of false arrest or false imprisonment (or their federal constitutional counterparts), presumably arising from Defendants' actions of compelling her to submit to a PBT and issuing her a minor-in-possession ticket. The parties do not address the disposition of this ticket in their briefs, but

Stephanie Strutz testified that it "got dismissed." (Stephanie Strutz Dep. at 66.) The disposition of this ticket might well be legally significant here, because the related *res judicata* and *Rooker–Feldman* doctrines would preclude Stephanie Strutz from challenging a state court's resolution of the minor-in-possession offense, at least to the extent that this resolution was unfavorable to her. *See Leach v. Manning*, 105 F.Supp.2d 707, 712–13 (E.D.Mich.2000). Since the parties have not addressed this issue, however, the Court cannot resolve this matter at this juncture.

ly, these state law claims survive summary judgment.

 For similar reasons, the Court rejects Defendants' various challenges to Plaintiffs' claims of malicious prosecution. First, while lack of probable cause is a necessary element of a malicious prosecution claim under Michigan law, *see Matthews v. Blue Cross & Blue Shield,* 456 Mich. 365, 572 N.W.2d 603, 610 (1998), the Court already has found that issues of fact remain as to the existence of probable cause to pursue resisting and obstructing charges against Mr. and Mrs. Strutz. Next, although Defendants contend that Plaintiffs cannot establish the "malice" element of a malicious prosecution claim, the courts have held that malice can be inferred from a lack of probable cause. *See Adams v. Metiva,* 31 F.3d 375, 389 (6th Cir.1994); *Matthews,* 572 N.W.2d at 610 & nn. 14, 15. Finally, to the extent that Defendants suggest that they are shielded from liability by virtue of the Oakland County Prosecutor's decision to pursue charges against Mr. and Mrs. Strutz, the case law confirms that a prosecutor's charging decision does not automatically insulate a police officer from liability for false statements in an incident report relied upon by the prosecutor. *See Matthews,* 572 N.W.2d at 610; *Payton v. City of Detroit,* 211 Mich.App. 375, 536 N.W.2d 233, 242–43 (1995). This is precisely the theory alleged by Plaintiffs in their complaint, and the record—in particular, Plaintiffs' deposition testimony, which differs in a number of respects from the account in Defendants' incident report—provides a sufficient evidentiary basis for this theory to withstand summary judgment.

 The Court agrees with Defendants, however, that Plaintiffs have failed to produce evidence in support of their abuse of process claim. As observed by Defendants, the Michigan Supreme Court has stated that an "action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585, 595 (1981) (internal quotations and citation omitted). Here, Plaintiffs allege only that Defendants made false statements in their incident report "in order to prompt the issuance of criminal charges and/or the bringing of a criminal prosecution against" Mr. and Mrs. Strutz. (Complaint at ¶ 76.) Plaintiffs have neither alleged nor produced evidence that Defendants took any improper action following the commencement of the criminal prosecution, but only that they improperly caused this prosecution to be commenced. Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiffs' abuse of process claims.

 Finally, the Court finds that the record lacks sufficient evidence to sustain Plaintiffs' claim of intentional infliction of emotional distress. Although the Michigan Supreme Court has yet to recognize this theory of recovery, the Michigan Court of Appeals has stated that "[l]iability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Graham v. Ford,* 237 Mich.App. 670, 604 N.W.2d 713, 716 (1999). Viewing the record in a light most favorable to Plaintiffs, the Court cannot say that Defendants' conduct was so utterly reprehensible and intolerable as to sustain a recovery under this theory. Rather, the evidence indicates that Defendants were, at worst, overzealous in their investigation of possible underage drinking and overly aggressive in responding to Plaintiffs' ef-

788

forts to resist the officers' warrantless entry into their home. Consequently, the Court awards summary judgment in Defendants' favor on this claim.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' June 30, 2003 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this Opinion and Order.